## FILES v. RANKIN.

(Circuit Court of Appeals, Eighth Circuit. April 3, 1907.)

No. 2,441.

1. SALES—RIGHT OF RESCISSION—FRAUDULENT CONCEALMENT OF FACTS BY PURCHASER.

While a purchaser, who stands on an equal footing with the seller as to access to means of obtaining knowledge of the value of the thing sold, is not bound to disclose any knowledge he may have on the subject, if in addition to keeping silent as to such knowledge he makes any statement which tends affirmatively to the suppression of the truth, or is calculated to deceive the seller, or to distract his attention from the real facts, his concealment becomes fraudulent, and will afford ground for a rescission of the sale.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 89, 92, 100.]

2. SAME.

Defendant purchased from the receiver of a national bank for $25 a judgment held by the bank against a deceased debtor amounting to over $9,000. At the time of the sale, the bank held, as collateral to the judgment, an assignment of a claim in favor of the debtor against an insolvent firm whose assets were being administered by the court, which was of considerable value, and on which a dividend had been declared and was then payable, amounting to nearly $900. Defendant knew of this collateral, but the receiver did not, having succeeded prior receivers who had lost the evidence of the transfer, and there being nothing on the receivers' books to put him on inquiry. Nor did the record in the insolvency case show that the bank was the owner of the claim. The receiver lived at a distance, and the negotiations for the purchase were conducted by correspondence, in which defendant made no mention of the collateral, but stated his understanding that the debtor had died insolvent after going through bankruptcy, and suggested that the claim would soon be barred by limitation, and that if handled at once a small sum might be realized, but even that was very doubtful. *Held*, that such statements and suggestions amounted to an active and fraudulent concealment of the facts, and entitled the receiver to a rescission of the sale.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 89, 91, 92, 100.]

Appeal from the Circuit Court of the United States for the Eastern District of Arkansas.

Since this case was here on the former appeal (Files v. Brown, 59 C. C. A. 403, 124 Fed. 133, to which reference is made for a general statement of the facts), the receiver has amended his petition and placed his right of recovery upon different grounds than before. This cause of action then was and now is an equitable one to set aside an administrative order made in the court below in the matter of the receivership of the First National Bank of Little Rock then pending in the court, authorizing the receiver of that bank to sell a cer-

tain judgment for $9,230.09 in its favor against one Kelso to defendant Files' for $25 and to rescind the sale made by the receiver pursuant to the terms of that order. Thereafter, and before defendant had taken any steps to realize on the judgment, the receiver filed his motion in the nature of a bill in equity to set aside the sale on the grounds of inadequacy of consideration and failure by Files to impart to the receiver knowledge which he possessed of the existence and value of certain collaterals held by the bank as security for the payment of the judgment. We held on the former appeal that neither inadequacy of consideration alone nor silence by the vendee as to his knowledge of the character or value of the thing sold warranted rescission of the contract, and to those propositions we still adhere; but we ordered the case remanded, with instructions to allow the receiver to amend his petition and to set up other facts, if such there were, which might entitle him to the equitable relief sought. Later an amended petition was filed in which it was charged that the bank held as collateral security for the payment of its judgment against Kelso three notes executed by Thomas H. Allen & Co. of Memphis, and payable to Kelso, aggregating about $9,000; that the maker of the last-mentioned notes had failed in business, and its estate was being administered in the court below for the benefit of its creditors; that before the sale of the Kelso judgment to defendant an order of distribution of 11 per cent. on all allowed claims against the estate of Allen & Co., among which was one in favor of the First National Bank on its notes held as collateral for the payment of the Kelso judgment, had been passed and by reason thereof a dividend of $989.70 was then due and payable to the receiver of the bank, and other money and property were then in the hands of the receiver of the estate of Allen & Co. sufficient to pay in all about $3,600 on the collateral so held by the bank; that while negotiations were pending for the sale of the judgment to defendant neither the receiver nor the Comptroller of the Currency, under whom he was acting, had any knowledge that the Kelso judgment was secured by the collateral mentioned, but that defendant was fully cognizant thereof, and instead of observing silence with respect thereto, as originally charged, he, with the purpose of securing the judgment for a nominal sum made statements and representations concerning the character and value of the judgment to the receiver which were false, fraudulent, misleading, and deceptive, and which did mislead and deceive him into selling the judgment for the inadequate sum of $25. Defendant in his answer to the petition, after denying that he made any false and fraudulent statements, alleged as follows:

"The defendant further says that at the time he purchased the judgment in controversy he believed that said judgment was secured by a collateral claim against the estate of Thomas H. Allen & Co., but he did not know it, and his information was meager and unsatisfactory. He had also been informed that there were assets in the hands of the receiver of said estate for the creditors thereof, but he has never examined the records to see what dividend, if any, had been declared."

The proof fully establishes the allegation last quoted, and in our opinion goes further and discloses that defendant not only believed that the judgment was secured by collateral, but that he knew it at the time he made the purchase in question. It establishes that some time before the sale of the judgment to defendant his attorney had seen and conversed with the receiver of Allen & Co. concerning the claim of the bank against the estate of Allen & Co., and that about the time of the purchase defendant and his attorney called on him and notified him that the bank had recovered a judgment against Kelso which had been purchased by defendant, and, as the claim of the bank against the estate was held by it as collateral security for the payment of that judgment, that he (defendant), as owner thereof, was the owner of the claim against the estate.

The evidence in the case, with the admissions found in defendant's answer, taken in connection with the fact that Files did not testify in his own behalf, satisfy us that he knew in the fall of 1902, while negotiating for the purchase of the judgment, that it was secured by the collateral in question, and that such collateral was of considerable value.

At a public sale of assets of the bank held in 1899, the judgment was offered for sale, but no bid was made for it, and it remained undisposed of.

Cockrill, the original receiver, resigned soon thereafter. Mr. Auten succeeded him and served for a short time, after which E. F. Brown succeeded him. Some time before Cockrill resigned, but how long the record does not disclose, the certificates of allowance in favor of Kelso which had been assigned to the bank were lost or misplaced, and as a result they were not turned over to his successors in the receivership; neither was there any memorandum or item in the books of the receivership showing the fact that the bank, held by assignment or otherwise. Kelso's certificates of allowance against the estate of Allen & Co., so that neither Auten nor Brown had any actual knowledge of that fact. The records in the case of Houchens v. Thomas H. Allen & Co., in which the affairs of the latter company were being administered, would have disclosed that Kelso had three allowances against the estate, and that certificates of such allowances had been made to him, but they would not have disclosed that Kelso had assigned them to the First National Bank. It was in 1902, a year after Brown became receiver, that negotiations were entered upon by defendant for the purchase of the Kelso judgment. Brown resided in Chicago, the Comptroller of the Currency was in Washington, and negotiations for the purchase were conducted by correspondence. Defendant opened the correspondence by inquiring of the Comptroller if the judgment was for sale. He was referred to Brown, the receiver, to whom he on August 27, 1902, wrote, suggesting that possibly he, by reason of being the owner of some of Kelso's notes, might have some interest in the judgment, and saying:

"If I could control the whole judgment I think there is a bare possibility of securing a· small amount in the way of dividends. As it is I am likely to get nothing. I am willing to pay a nominal sum for the bank's interest, which is, say, two-thirds, or thereabouts."

It is not now pretended that defendant had any interest in the judgment sold. Neither is it contended that his representations to Brown were intentional misrepresentations about that matter. After some correspondence defendant offered $25 for the judgment. That offer was rejected, and the Comptroller on September 15, 1902, directed receiver Brown to dispose of the judgment at public auction at the termination of his receivership. Nothing more was done in the matter until October 6th, when defendant reopened negotiations by writing the following letter to receiver Brown:

"Dear Sir: Your letter to H. F. Auten, Esq., inclosing a letter from the Comptroller of the Currency, of date September 15, 1902, in regard to the offer of $25.00 by me for a judgment in favor of the First National Bank against J. G. Kelso, deceased, in the United States court at Texarkana, has been shown to me by Mr. Auten. I note that the Comptroller declines the offer, and directs you to sell the judgment at public auction at the time you terminate your receivership. Mr. Auten advises me that it will be impossible to close the litigation under two years, perhaps longer, and as this claim will be barred by the statute of limitation within a short time, and thus whatever value it might have, if any, be lost, permit me to suggest that a sale now, at public auction, or otherwise would give the purchaser the benefit of whatever value it might have. At a sale two or more years from now it would probably go off like it did at the former sale—'No bidders,' hence no sale. My understanding is that Mr. Kelso went through bankruptcy and died insolvent. Hence you will see that if any value attaches now it would be lost by a delay of two or three years. If it could be handled at once, a small sum might be realized, but even that is very doubtful, and unless sold at once, or in the very near future, it will be valueless. I own about one-third of the judgment, bought it with other assets at receiver's sale, December 11, 1899, and if I didn't own that interest I wouldn't care to bother with the matter. Kindly submit the matter to the Comptroller as to an early sale, and advise me of his conclusion in the premises.      Very truly yours,                          [Signed]  A. W. Files."

The letter was forwarded to the Comptroller, who authorized the receiver to use his discretion. That officer finally relying upon the representations and statements found in the letters of August 27th and October 6th, and with no personal knowledge of the value of the judgment, concluded a sale to defendant for $25, and secured an order of the court permitting him to assign the judgment for that consideration. A decree rescinding the sale was rendered by the Circuit Court, and it is from such decree that this appeal is prosecuted.

W. S. McKain, for appellant.

Moore, Smith & Moore, for appellee.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge, after stating the case delivered the opinion of the court.

It is first contended by defendant that he and receiver Brown stood on an equal footing; that Brown knew, or by the exercise of ordinary care could have known, as much about the value of the judgment as he knew; and that in such circumstances the receiver had no right to rely upon any fraudulent representation or concealment which he (defendant) might have practiced. On the facts so assumed the proposition of law contended for cannot be disputed. It is well settled that where the means of knowledge are at hand and equally available to both parties, and where a party, instead of resorting to them, sees fit to confide in the statements of one whose interest it is to mislead him, the law will afford him no redress against his own imprudent confidence. Cooley on Torts, *p. 487; Slaughter's Adm'r v. Gerson, 13 Wall. 379, 20 L. Ed. 627; Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931; Yeates v. Pryor, 11 Ark. 58; Hill v. Bush, 19 Ark. 528. But in the light of the pleadings and proof we are unable to view the facts as claimed. Defendant knew that the allowed claims of Kelso against the Allen estate stood pledged as collateral for the payment of the Kelso judgment, and he knew that they were of considerable value. Of those facts Brown knew nothing. Neither did his immediate predecessor have any knowledge. What Cockrill, the first receiver, knew concerning them, is not disclosed; but it is a fact that, when he offered the assets of the bank at public auction in 1899, no one considered the judgment of any value. It was offered for sale, but no bid was received for it. If he then or subsequently had the assignments of Kelso's allowances against the Allen estate in his possession, they doubtless were considered of no value. They certainly disappeared, and neither they nor any memorandum of them were ever transmitted to his successors to evidence any claim of right on the part of the bank against the Allen estate. The testimony of both Brown and his predecessor, Auten, to the effect that they had no knowledge of the existence of any such claim, stands uncontradicted. But it is said that Brown could have acquired accurate information by investigating the means at hand and available to him for that purpose. It is claimed that, if he had investigated the records of Houchens v. Allen & Co., and made inquiries of the receiver in charge of the estate of that company, he could and would have ascertained the truth. We are unable to perceive, in the absence of anything in his own records, or in his own possession to suggest investigating the Houchens Case, what should have moved him to make an investigation of that any more than any other case; but suppose reasonable diligence would have put him upon some inquiry in that case, and suppose he would have discovered that certain allowances had been made in favor of Kelso, we do not perceive how that fact would have given

him any knowledge or suggestion that Kelso had assigned the claim to the bank as security for the payment of his judgment. From all the evidence we are unable to find that any such opportunities for information were open to Brown as would have put a reasonably prudent person upon inquiry concerning the facts which gave the Kelso judgment exceptional value.

This brings us to a consideration of the contents of the two letters of August 27th and October 6th, written to the receiver Brown by defendant and of their legal effect upon the transaction in question.

Defendant, with the knowledge possessed by him of the value of the judgment, was dealing with a person residing at a distance. He desired to buy the judgment. However full his information might be, he was under no obligation in law to impart that knowledge to the owner of the judgment. Files v. Brown, 124 Fed. 133, 59 C. C. A. 403. Standing in no fiduciary relation to him, and owing him no duty to make disclosure of his information, he might have observed strict silence on the subject and have reaped the full advantage which his diligence in securing information gave him; but any activity on his part, which directly or indirectly tended to put the vendor off his guard or mislead him to his injury, would afford ground for the rescission of the sale.

In Laidlaw v. Organ, 2 Wheat. 178, 4 L. Ed. 214, Chief Justice Marshall stated the case and delivered the opinion of the court, as follows:

"The question in this case is whether the intelligence of extrinsic circumstances, which might influence the price of the commodity, and which was exclusively within the knowledge of the vendee, ought to have been communicated by him to the vendor? The court is of opinion, that he was not bound to communicate it. It would be difficult to circumscribe the contrary doctrine within the proper limits, where the means of intelligence are equally accessible to both parties. But at the same time, each party must take care not to say or do anything tending to impose upon the other."

Lord Eldon, in Turner v. Harvey, Jacob's Reports, 178, after declaring the purchaser's right in general to keep silence, said as follows:

"Very little is sufficient to affect the application of that principle. If a word, if a single word, be dropped which tends to mislead the vendor, that principle will not be allowed to operate."

Pomeroy, in his work on Equity Jurisprudence (volume 2, § 901), after laying down the rule that in cases unaffected by fiduciary relations silence by one of the contracting parties having a peculiar knowledge of the subject may be observed with impunity, makes the following statement:

"If, in addition to the party's silence, there is any statement, even any word or act on his part, which tends affirmatively to suppression of the truth, to a covering up or disguising the truth or to a withdrawal or distraction of the party's attention or observation from the real facts, then the line is overstepped, and the concealment becomes fraudulent."

Story, in his work on Sales ([4th Ed.] §§ 175, 177), observes as follows:

"If a vendee have private information with regard to any extrinsic fact or event, which materially affects the value of the subject-matter of sale, he would

not be legally bound to divulge it, unless a special trust were either expressly or impliedly reposed in him. * * * Such cases are, however, closely scrutinized, and it behooves a person taking such an advantage to be careful lest he say anything which is calculated in the slightest degree to mislead, for the smallest fraud is sufficient to poison a contract. * * * If there be any studied efforts [on the part of either party to a contract of sale] to prevent the other from coming to any knowledge relating to the sale and, especially if there be any false suggestion or representation, however slight, the transaction will be fraudulent and void."

Applying the foregoing well-established principles to the facts of this case, we cannot escape the conviction that defendant did not observe that indifferent attitude toward the transaction which was required of him. There seems to have been a covert attempt on his part to attract the receiver's attention to all the facts which minimized the value of the judgment and to turn his attention from those which magnified that value.

Defendant had some time in September, 1902, offered $25 for the judgment at private sale. The Comptroller declined to sanction the sale for that sum, and so advised the receiver, and directed him to dispose of the judgment at public auction at the termination of his receivership. It is in the light of all these facts that the letter of October 6th should be considered. Defendant wanted to buy the judgment, had made an offer for it which had been rejected, and negotiations had apparently closed. Upon the determination of the Comptroller to sell it at public auction, defendant volunteered his good services. In the letter of October 6th he gratuituosly suggests that the sale of the judgment at public auction at the time of the termination of the receivership would postpone it so long that the statute of limitations might bar recovery upon it. He incidently alludes to Kelso's death, insolvency, and bankruptcy, and says:

"Permit me to suggest that a sale now at public auction or otherwise would give the purchaser the benefit of whatever value it might have. * * * If any value attaches now it would be lost by delay of two or three years. * * * If it could be handled at once, a small sum might be realized; but even that is very doubtful. Kindly submit the matter to the comptroller," etc.

That letter, by its suggestive references to the death, insolvency, and bankruptcy of Kelso, to the worthlessness of the judgment and to the need of hasty action to realize even a small sum and prevent the bar of the statute of limitations, went far beyond that silence which the law under the circumstances permitted defendant to indulge. He had knowledge of the value of the judgment which he artfully concealed. His suggestions were well calculated to divert the mind of the vendor from inquiring concerning the value of the judgment, to forestall the public auction and secure acceptance of his once rejected offer. The receiver acted upon them, accepted the original offer, and closed the sale.

Counsel for appellant invokes the principle that mere expressions of opinion as distinguished from statements of fact are not actionable. That proposition may be conceded, but from what has already been said there is more in this case than that. There was such an artful concealment of facts by the purchaser as was calculated to and did mislead the seller, throw him off his guard, and prevent his

making an independent investigation as to the value of the subject of sale. Under the authorities cited, this, without more, is enough to warrant a rescission of the sale.

The case was tried below in harmony with the principles now announced, and the decree as rendered is affirmed.