## CLARK v. LYSTER.

(Circuit Court of Appeals, Eighth Circuit. April 27, 1907.)

No. 2,458.

1. PARTNERSHIP—PARTNERSHIP PROPERTY—REAL ESTATE USED IN BUSINESS.

Real estate not purchased with partnership funds does not become partnership property, though used for partnership purposes, unless there is some agreement that it shall be so considered.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Partnership, §§ 101–108.]

2. MORTGAGES—MORTGAGEABLE INTEREST—ELIGIBILITY TO RECORD.

Two partners in a manufacturing business who owned the real estate used therein as equal tenants in common entered into a contract by which one retired from active participation in the business but remained as a silent partner for a term of five years, leaving the most of his capital invested. He also conveyed to his partner his half interest in the real estate "as a basis of credit," but took a bond for its reconveyance absolutely and unconditionally at the end of the term without subjecting it, as between the parties, to the risks of the business. After the expiration of the term, when he had become entitled to a reconveyance but had not received it, he executed a mortgage on his interest in the real estate to secure a valid indebtedness. *Held*, that such real estate was not property of the partnership but of the individual partners; that the mortgagor was the equitable owner of a half interest therein which was mortgageable as real estate, and that the mortgage given was valid, no rights of partnership creditors having intervened, and was entitled to record under Gen. St. Kan. 1901, § 1221, if not as a technical mortgage, as "an instrument in writing" affecting real estate, which record was constructive notice to all subsequent purchasers of its contents.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Mortgages, §§ 10, 11, 201.]

3. ESTOPPEL—EQUITABLE ESTOPPEL—ACTS CREATING.

In a suit to foreclose a mortgage, given to complainant by his son, against a grantee of the property, it appeared that defendant and the mortgagor were partners in a manufacturing business, and owners as tenants in common of the real estate used in the business. They entered into a contract by which the mortgagor retired as an active partner, but remained for a term of five years as a silent partner, leaving the most of his capital in the business, and also making defendant a loan to be used in the business and accounted for subject to its risks. He also conveyed his interest in the real estate to defendant "as a basis of credit," but took a bond for its reconveyance at the end of the partnership term. About that time he and defendant became involved in litigation respecting the latter's accounting under the partnership agreement, which did not, however, involve or affect the real estate. Pending such litigation, and after he had become entitled to a reconveyance of the real estate but had not received it, he executed the mortgage in suit to complainant, covering his interest in such real estate, to secure a valid indebtedness, which mortgage was duly recorded. Subsequently a settlement of the litigation was effected between the parties by which defendant paid the mortgagor a sum of money in full of his interest in the business and the loan and received a quitclaim deed to the mortgagor's interest in the real estate. Nothing was said in regard to the mortgage, and defendant had no actual knowledge of it. Complainant, who resided in another state, hearing of the pending settlement, visited his son, and, on completion of the settlement, received part payment of the mortgage debt from the proceeds, a portion of which he gave to his son to be invested for the benefit of his family. It was in dispute whether he arrived before or after the completion of the

settlement, but in any event he took no part therein. *Held,* that there was nothing in such facts or in complainant's conduct which created an equitable estoppel to prevent him from enforcing his mortgage against the property for the balance due him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Estoppel, §§ 165–187.]

Appeal from the Circuit Court of the United States for the District of Kansas.

This was a bill in equity to foreclose a mortgage given April 27, 1901, by Herbert H. Clark and his wife to Harvey S. Clark, his father, conveying an undivided one-half interest in certain real estate situated in Wilson county, Kan., to secure the payment of certain notes amounting to $35,000 described in the mortgage, upon which $19,500 remained unpaid when the suit was brought. This mortgage was duly recorded in the office of the register of deeds of Wilson county on April 29, 1901. The mortgagors and also one Frederick E. Lyster, who held the title to the mortgaged premises at the time the suit was brought, were originally made defendants. Subsequently the suit was dismissed as to the Clarks and prosecuted only against defendant Lyster. His answer admits the execution of the mortgage as charged, but avers that at the time it was given Clark, the mortgagor, had no mortgageable interest in the land conveyed, that the notes claimed to have been secured by the mortgage had all been paid and satisfied, and that the mortgagee by reason of certain facts was estopped in equity from enforcing his security. The main facts, as disclosed by the pleadings, proof, and proceedings below, are as follows: Defendant Lyster and Herbert Clark, the mortgagor, had prior to April 27, 1895, been copartners in the manufacture of linseed oil, and were then the owners in fee simple, as tenants in common, each of an undivided one-half interest in the real estate which had been used by them in connection with their manufacturing business, the one-half of which belonging to Clark constituted the land which he subsequently mortgaged to his father. Their partnership was on that day dissolved, and a new agreement entered into by which Clark was to retire from active participation in the business, but to retain as a silent partner for a term of five years thereafter his interest in it. He agreed to leave his portion of the partnership capital, except $5,000, in the business, to loan Lyster $25,000 for five years, to pay annually to Lyster $2,500 in lieu of rendering personal services in carrying on the business, and in order to afford Lyster a basis of credit and commercial standing he agreed to convey and did convey to Lyster by a quitclaim deed his one-half undivided interest in the mill property, taking from Lyster a bond for a deed to reconvey the same to him on September 1, 1900. They proceeded with the business under the new agreement until about the expiration of the term, when Clark brought his action against Lyster to wind up their partnership business and for an accounting of all moneys due to him from Lyster under the agreement of April 27, 1895. On March 1, 1902, while that action was pending, Clark and Lyster settled and compromised all their differences involved in the suit. Lyster paid Clark $40,000 in full of all his dues, whether for money loaned or profits made. Clark dismissed his suit, and agreed to and did convey by a quitclaim deed his one-half equitable interest in the mill property which he had on April 27, 1901, mortgaged to his father and for which he then held Lyster's bond for a deed. At the time of that settlement Lyster had no actual as distinguished from constructive knowledge of the existence of the mortgage sued on, or of the fact that Clark's father had any right or interest in the property, and believed he was acquiring from Clark an unincumbered title to the same. After Clark received the $40,000 from Lyster pursuant to the terms of the settlement, he paid more than $16,000 of it over to his father in partial satisfaction of the mortgage debt, and the latter, being then 79 years old, made a present to his son of $10,000 to be invested for the support of his family. Lyster, after making his settlement with Clark on March 2, 1902, under the belief that he was the owner of an unincumbered title to the land in question, erected thereon permanent improvements of the value of $20,000, and was not actually informed of complainant's claim until this suit was be-

gun, July 10, 1902. The court below by consent of parties appointed a special master to take testimony and return the same, with his findings of fact based thereon, to the court. The master heard the proof, made a finding of the foregoing main facts, and also found (using his language) that: "Close confidential relations existed at all times between Harvey S. Clark and Herbert H. Clark; the father was generous to the son, and to a considerable extent was dominated by the son. The settlement was brought to a close after Harvey S. Clark had come to Kansas City in order to be present when the settlement was made, and at a time when Harvey S. Clark was dwelling with his son Herbert H. Clark. Of the proceeds of said settlement Harvey S. Clark presented Herbert H. Clark with about $10,000 to invest for the latter's family, although Herbert H. Clark was then still indebted to Harvey S. Clark in the sum of nearly $20,000. From these facts, as well as from the contradictory evidence which Harvey S. Clark gave and the lack of interest which he manifested while testifying, I find that Harvey S. Clark authorized the settlement which was made by Herbert H. Clark with Lyster, and that the attempt to foreclose the written instrument described in the bill of complaint is an afterthought conceived by Herbert H. Clark, who overpersuaded his father to undertake it." He also specially found that "neither during the negotiations for settlement nor at the time of the settlement and payment of the $40,000 was anything said one way or the other by any of the parties engaged therein concerning the said mortgage," and that Clark, in consideration of the receipt of $40,000 from Lyster, agreed to and did accept the same in full settlement and satisfaction of the indebtedness due him from Lyster, which he found to be $38,279.45, and agreed "to make, execute and deliver to said Lyster at the time said $40,000 is paid a good and sufficient quitclaim deed of conveyance of all of his right, title and interest in and to" the property which was mortgaged. He also specially found that the issue involved in the accounting suit between Clark and Lyster "did not embrace or involve or include any questions pertaining to the real estate or the reconveyance thereof or other matters provided for in the bond of date April 27, 1895, but only as to the moneys loaned and left in the business by the said Herbert H. Clark and the earnings of the business." The master reported in favor of a dismissal of the bill on the ground that it would be unjust and inequitable to defendant Lyster to have the mortgage enforced. The Circuit Court overruled exceptions duly filed to the master's report, confirmed the same, and entered a decree dismissing the bill. From that decree an appeal is prosecuted to this court.

Thomas J. White and W. Littlefield (A. N. Gossett, on the brief), for appellant.

Charles W. Webster (John P. Gilmer and J. W. Crowley, on the brief), for appellee.

Before SANBORN and ADAMS, Circuit Judges.

ADAMS, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Notwithstanding the fact that Harvey S. Clark, the mortgagee, has died since the institution of this suit and his personal representative has been substituted in his place, we shall frequently refer to the parties as they originally appeared. The substantial facts of the case are, as observed by the learned trial judge, practically undisputed, and we are to determine and adjudicate the rights of the parties thereunder. There is no doubt about the bona fides of the transactions between Harvey S. Clark, the mortgagee, and his son Herbert, which resulted in an indebtedness of the latter to the former in the amount of $35,000, the giving of the notes to represent the indebtedness, the execution of the mortgage to secure their payment, or the actual pur-

pose of the parties to pledge whatever interest the son had in the real estate mortgaged to secure the payment of his indebtedness to his father. It is conceded that the son had paid the entire indebtedness excepting $19,500, and that the latter amount constituted a bona fide debt due on one of the notes described in the mortgage from the son to the father at the time this suit was brought. Notwithstanding the fact that numerous assignments of error are made, it is clear, as treated by the trial court, that two controlling questions are decisive of the case: First. Was the son's interest in the land which was conveyed by the mortgage subject to alienation as land, so as to entitle the mortgage deed to be recorded in the land records of the county and render its record constructive notice to subsequent purchasers? Second. Was the mortgagee's conduct in receiving from his son, the mortgage debtor, a part of the proceeds of the settlement between him and Lyster and otherwise, such as estops him in equity from foreclosing his mortgage for the balance due him? These questions will be considered in their order.

To properly apply the law, an accurate understanding of the relation of the parties as between themselves and as to creditors should be first stated. As between the mortgagor, Herbert Clark, and Lyster, the former undoubtedly owned the land in question and had a recognized vendible interest in it in 1895. The contract and bond for a deed executed by Lyster to Herbert on April 27, 1895, recited that Clark was then "the owner in fee simple of an undivided one-half interest" in the premises, and he then conveyed the same to Lyster for the purpose, as stated in the contract, of giving him credit and commercial standing as the managing partner of the partnership then formed between them. The contract and bond clearly disclose that as between the parties, so far as their rights against each other were concerned, the undivided interest conveyed by Clark to Lyster was not to be treated as partnership property, or as such made subject to any demands of Lyster against Clark on any possible accounting which might accrue to him. The contract and bond carefully discriminated between the loan of $25,000 made by Clark to Lyster and the conveyance of Clark's undivided interest in the land to Lyster. It subjected the loan to all the chances and hazards of the business. It provided that "on the first day of September, 1900, he" (Lyster) "will pay to said second party" (Clark) "the sum of $25,000 so loaned to him, conditioned, however, that in case of loss of any part of said loan by the first party in the legitimate transaction of the business herein provided for, then one-half of said amounts so lost beyond the control of said first party" (Lyster) "shall be deducted from said loan and the remainder of said amount" ($25,000) "shall be considered the amount due from the party of the first part to the party of the second part," etc. On the other hand, the contract and bond subjected the undivided interest transferred by Clark to Lyster to none of the chances and hazards of the business. It contemplated and in terms provided that it should be conveyed to Lyster and employed by him "as a basis of credit and commercial standing for the advantage and upbuilding of the business"; it contained an express covenant in the form of a bond that the interest should be reconveyed by Lyster to Clark on Septem-

ber 1, 1900, and, in the same clause which subjected the money to the chances and hazards of the business, it provided, concerning the land conveyed by Clark, as follows:

"That at the expiration of the five years for which this contract runs he" (Lyster) "will reconvey the premises herein described as hereinbefore provided" (referring to the absolute and unconditional terms of the bond) "to the said second party, his heirs or assigns, inevitable wear, decay, loss by fire or otherwise excepted."

From these provisions of the contract it appears that according to the intent, purpose, and agreement of the parties the land was not to become partnership assets, but was to remain the individual property of Clark and be reconveyed to him absolutely and unconditionally on a day fixed, without regard to any liability which might then exist in favor of Lyster against Clark arising out of the partnership business. Whether and how far real property is partnership assets depends upon the intention or agreement of the parties. 1 Jones on Mortgages, § 119; Brown v. Morrill, 45 Minn. 483, 48 N. W. 328; Collumb v. Read, 24 N. Y. 505.

American and English cases very generally hold that real estate not purchased with partnership funds does not become partnership property, though used for partnership purposes, unless there is some agreement that it shall be so considered. Story on Partnership (7th Ed.) §§ 94 and 95, note B, and cases cited. A mere agreement to use real property for partnership purposes is not sufficient to convert it into partnership stock. There must be some evidence of further agreement to make it partnership property. 1 Lindley on Partnership (2d Am. Ed.) p. 332 et seq., and cases cited; Shafer's Appeal, 106 Pa. 49; Alexander v. Kimbro, 49 Miss. 529; Ware v. Owens, 42 Ala. 212, 94 Am. Dec. 672.

In Frink v. Branch, 16 Conn. 260, 269, facts were considered very similar to those in this case, and it was there held that the property was not partnership assets; the court saying:

"This property was not purchased with common funds, nor was any common capital withdrawn from the power of creditors to make the purchase, nor was there any agreement that the property thus owned in common should become partnership stock or constitute any part of the capital of the company. It was agreed, by parol only, that this property should be improved by the company in the prosecution of its business; but this agreement extended only to its temporary use. It did not, nor could it, affect the title to the land, even as between the parties, much less as the rights of others might be involved."

In Reynolds v. Ruckman, 35 Mich. 80, which was a suit for the foreclosure of a mortgage given by one of two partners who held an undivided one-half interest as tenant in common with his copartner in property made use of for partnership purposes, the defense set up was that it was partnership assets. Chief Justice Cooley, in delivering the opinion of the court, said that cases "in which the lands have been purchased with partnership funds can have no application here. * * * Real estate held by partners may or may not be partnership property; but usually it is not so unless partnership assets have been used to purchase it, or unless it was put in originally as a part

of the joint estate. But generally the fact that two or more persons make use of property in which their interests are apparently several, for partnership purposes, is very far from indicating an understanding that it is partnership estate."

Before the time arrived for the execution of the deed from Lyster to Clark, pursuant to the terms of the contract and bond, they became estranged; litigation ensued, and Clark brought his action against Lyster for an accounting concerning the partnership business. According to the proof and to the finding of the special master, that suit involved no question concerning the real estate or the reconveyance thereof by Lyster, but related exclusively to an accounting for the money loaned and left in the business by Clark and the earnings of the business. No creditors of the firm appeared or intervened in that suit, and, so far as this record discloses, there were no creditors of the firm at the time that suit was settled in March, 1902. There were none in April, 1901, when Clark executed his mortgage to his father, and no questions are now involved in this suit which in any manner concern creditors. So that for the purpose of this case we are dealing with no assets in which creditors or any other persons except Clark and Lyster and the mortgagee of Clark have any rights. In this condition of things the learned trial judge held that on April 27, 1901, when the mortgage was given by Clark, he had no interest in the land which he could mortgage, but had only an equitable right to an accounting; that the mortgage in question amounted only to an assignment of Clark's right as a partner to enforce an accounting; and cited as sustaining his conclusion the following cases: Bank v. Carrollton R. R., 11 Wall. 624, 20 L. Ed. 82; Shanks v. Klein, 104 U. S. 18, 26 L. Ed. 635; Rommerdahl v. Jackson, 102 Wis. 444, 78 N. W. 742; Collumb v. Read, supra; Goldthwaite v. Janney & Cheney, 102 Ala. 431, 15 South. 560, 28 L. R. A. 161, 48 Am. St. Rep. 56; Page v. Thomas, 43 Ohio St. 38, 1 N. E. 79, 54 Am. Rep. 788; Seeley v. Mitchell's Assignee, 85 Ky. 508, 4 S. W. 190; Beecher v. Stevens, 43 Conn. 588; Hewitt v. Rankin, 41 Iowa, 35; Lindley on Partnership (2d Am. Ed.) * 341 and note B. Those were cases in which one partner assigned his entire interest in the partnership property to an outsider, or in which title to real estate purchased with partnership funds or originally contributed to the partnership capital was involved. In the first class of cases it was held that the outsider did not, by the assignment, become a partner, but acquired the right to an accounting only. In the second class of cases it was held that the real estate, in whosesoever name it stood, was held in trust for creditors and other copartners till their interests were satisfied or waived.

By reason of the peculiar facts involved in those cases and the legal principles applicable to them they afford no authority for the disposition of this case, which involves totally different facts and is governed by different principles. The case of Hewitt v. Rankin, supra, was a suit to foreclose a mortgage upon partnership property in which priority of liens was involved. The Supreme Court, in delivering its opinion, said:

"Real estate held by a partnership is to be regarded as the property of the firm, as to the creditors and all persons dealing with it, where necessary to

protect their rights. * * * When the business of the partnership is closed, and its debts are paid and there are no equities in favor of third persons requiring real estate of the firm to be held subject to the foregoing rule, the partners, or their representatives, hold a direct interest therein, and, as between them, it is to be regarded as real estate, and subject to all the rules applicable thereto. In such cases it is to be regarded as the real estate of the partner in favor of his individual creditors. The conversion of real estate into personalty under the rule first above stated is a device of equity in order to effectuate the settlement of partnerships and to devote all the property to the payment of the firm debts, a result highly equitable, which the courts will never fail to attain. The reason of the rule ceasing in the absence of creditors of the firm, or others having like equities, the rule itself should no longer be applied. Hence the exception we have just stated." Citing Wilcox v. Wilcox, 13 Allen (Mass.) 252, and a number of other cases.

Eight months before the time Clark executed the mortgage to his father the partnership between him and Lyster had been dissolved; there were no outstanding debts, and Lyster had no direct or contingent right in Clark's interest. Clark then, according to the true intent and meaning of their contract, was the equitable owner of the undivided interest in the land, unaffected by any of the partnership obligations. Lyster was in default. He had allowed eight months to pass without complying with the imperative condition of his bond to reconvey Clark's interest to him. In that condition of things, if Lyster had done his duty and had reconveyed the land to him according to his obligation, Clark would have had the combined legal and equitable title to it, and could undoubtedly have mortgaged or sold it at his pleasure.

In view of these facts, it is contended by the defendant that as Clark did not have the legal title to the land when he executed the mortgage to his father, but only an equitable right to it by reason of Lyster's bond, he had no mortgageable interest in it. This is not the law. Clark had a perfect equitable title which, except for Lyster's default, would have been converted into a legal title. That equitable right was the subject of sale and mortgage. Reed v. Munn (C. C. A.) 148 Fed. 737, recently decided by this court. It was so held by the Supreme Court of Kansas in Jones v. Lapham, 15 Kan. 540, 544. That case involved the very question now under consideration. The holder of a bond for a deed had given a mortgage upon his equitable right quite as Clark did in this case. Mr. Justice Brewer, then Judge of the Supreme Court of Kansas, said concerning it as follows:

"Again, it is said that Hull had no mortgageable interest in the land. This is a mistake. True, he did not hold the legal title, but he had an interest in the property. A bond for a deed is often in equity declared to be equivalent to a conveyance of the property with a mortgage back. His was an interest which was the subject of sale, and would pass by a deed of the property. Gen. St. 1869, p. 999, c. 104, § 1, cl. 8; page 185, c. 22, § 2. It was an interest which he could use as security for a loan, and could pass for that purpose by an ordinary real estate mortgage."

That ruling is binding upon us as a rule of property established by the highest judicial tribunal of a state. Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359.

The mortgage of Clark to his father was a recordable instrument under the laws of Kansas. It was an instrument conveying and af-

fecting real estate. "Every instrument in writing that conveys any real estate, or whereby any real estate may be affected, proved or acknowledged, and certified in the manner hereinbefore prescribed, may be recorded in the office of the register of deeds of the county in which such real estate is situated." Section 1221, G. S. 1901. It was filed and recorded in the office of the register of deeds of Wilson county on April 29, 1901, and imparted notice to everybody of its contents. "Every such instrument in writing, certified and recorded in the manner hereinbefore prescribed, shall, from the time of filing the same with the register of deeds for record, impart notice to all persons of the contents thereof; and all subsequent purchasers and mortgagees shall be deemed to purchase with notice." Section 1222, G. S. 1901. Even if the instrument recorded was not a mortgage, technically speaking, it was an instrument of writing recorded in the county where the land in question was situated, and as such imparted notice to every person of its contents and of the extent to which it affected Clark's title. Section 1, of chapter 124, p. 232, of the Session Laws of Kansas of 1901, obviously intended as a curative and remedial provision, reads as follows:

"All deeds, mortgages, releases, powers of attorney, leases, contracts, conveyances and other instruments of writing now recorded, copied or noted in the proper books of the office of register of deeds of the several counties in the state of Kansas, shall, upon the passage of this act, be deemed to impart notice to subsequent purchasers, encumbrancers, lessees and all other persons whomsoever so far as and to the extent that such deeds, mortgages, releases, powers of attorney, leases, contracts, conveyances and other instruments of writing may be found recorded, copied or noted on said books of record, notwithstanding any defects existing in the execution, acknowledgment of recording or certificate of recording of the same."

That section took effect May 1, 1901. Complainant's mortgage had then been recorded two days. Lyster purchased the property from the mortgagor nearly a year thereafter, at a time when the public land records fully disclosed the existence and effect of the incumbrance.

Within the purview of each and all the foregoing statutes, the recording of the mortgage was notice to every one of the contents of the instrument and the extent to which it affected the title to the real estate conveyed. In any view we may take of the mortgage in question, whether as a perfect deed of conveyance or an imperfect execution of an intention, it was a recordable instrument under the laws of Kansas, and its record imparted full notice of its contents and effect to all persons whomsoever. The fact disclosed by the record, that Lyster had no actual knowledge of the existence of the mortgage or that he believed the land he was about to purchase from Clark was unincumbered, is quite immaterial. He was bound by law to take notice of the recorded incumbrance, and is conclusively affected with all he could have ascertained by doing so. Poplin v. Mundell, 27 Kan. 138; Smith v. Jones, 37 Kan. 292, 15 Pac. 185; Kuhn v. Nat. Bank of Holton (Kan.) 87 Pac. 551.

The only other question requiring consideration is whether Harvey S. Clark, the mortgagee, is estopped from foreclosing his mortgage. He was the holder in good faith of a mortgage to secure

a just debt due from the mortgagor to him. He did nothing or said nothing to induce Lyster to purchase his son's interest. He did nothing or said nothing to conceal the fact that his son's interest was subject to a mortgage, or to induce Lyster to refrain from examining the land records to ascertain whether the son's interest was free from incumbrance. He lived in Illinois, and when informed that his son was about to settle his suit against Lyster and collect a large amount of money he went to Kansas City, where his son resided and where the collection was to be made, for the purpose of securing payment of his son's debt to him. By reason of the estrangement between the son and Lyster they had no personal interviews, but negotiated their settlement through their solicitors. There is a conflict of evidence as to whether the father arrived in Kansas City before or after the settlement was concluded, and before or after the son had executed his quitclaim deed to Lyster; but however that may be, it is certain the father did not see or have any interview with Lyster or his solicitors until after the transaction had been fully concluded. There was, therefore, no opportunity for this aged man, however disposed he might have been, to deceive Lyster, or any one acting for him in the matter. His chief and only offending is found by the special master to consist of having "close confidential relations with his son"; of being "generous to his son"; of being dominated by his son "to a considerable extent"; of dwelling with his son while in Kansas City attempting to get his debt paid or reduced; of presenting to his son $10,000 out of the money received from him "to be invested for the benefit of his family." From such relations with and disposition toward his son, which seem to us altogether natural and blameless, together with what the master denominates "contradictory evidence" given by the father (without referring to it, and which after a patient investigation we are unable to discover), and a "lack of interest" (a commendable frame of mind for a witness) which the master says the old gentleman manifested while testifying, he reached the conclusion that the father authorized the settlement between the son and Lyster, and that it would be unjust and inequitable to permit him to foreclose his mortgage to secure the payment of $19,500, due him from the son. Suppose it be true that the father did authorize the settlement which the son made with Lyster, that fact would have no significance unless the settlement as made purported to involve the conveyance to Lyster of an unincumbered title to the sons's one-half interest. But there is no claim that such was the fact. The settlement as made required the son to give a quitclaim deed to Lyster for his one-half interest. That is entirely consistent with the fact as it existed that his interest was incumbered.

From the facts disclosed by this record, and even from the findings made by the master, there is no substantial ground for imputing to Harvey S. Clark, the mortgagee, any fraudulent, wrongful, misleading or injurious conduct toward Lyster which in any manner tended to induce him to believe he was purchasing an unincumbered title to the son's undivided interest, or to refrain from resorting to the land records and making the inquiry which common prudence and the law of the land required of him. The worst that can be said against the

father is that he did not ascertain the whereabouts of the respective solicitors for his son and Lyster while they were negotiating the terms of the settlement and volunteer to instruct Lyster concerning his duty. If he had been present with them he might lawfully have observed silence on the subject under consideration. Files v. Rankin (C. C. A.) 153 Fed. 537, recently decided by this court. But he was in fact both distant from them and absolutely silent. The rule caveat emptor applies, and Lyster cannot complain.

It is again said, that because the father received of a son a part of the proceeds of the settlement made with Lyster and was generous to his son's family, these facts in some way make against the father's equity in this case. We fail to see in them anything injurious to Lyster. Whatever became of the money paid by Lyster to the son did not concern the former. It was not his money. He owed money to the son which he paid, and the son owed money to his father, a part of which he paid, and the father afterwards made a donation to the son's family. If there was any doubt about the mortgage debt these acts might have been significant; but on the proof and findings no such doubt exists. Accordingly, the acts in question must be referred to their natural motive—a desire to close a business transaction, and to practice, so far as the father is concerned, a little of the praiseworthy generosity which the master finds characterized his general conduct toward his son. By such inoffensive conduct as that already considered, defendant Lyster contends that complainant's contract, duly and formally executed in writing and under seal, should be set aside and his rights thereunder forfeited. To strike down rights secured with such care and formality by resort to the doctrine of estoppel in pais, every consideration of justice requires that the proof should be clear, cogent, and convincing, and the facts leading to that result should be clearly established. Brant v. Virginia Coal & Iron Co., 93 U. S. 326, 334, 23 L. Ed. 927; First National Bank v. Marshall & Ilsley, 28 C. C. A. 42, 83 Fed. 725, 735. The evidence adduced in this case falls far short of that reasonable requirement, and facts are not established from which complainant can be justly and equitably decreed to be estopped from enforcing his legal rights.

Again, equitable estoppel is generally predicated upon positive or constructive fraud, or gross negligence tantamount to it. Unless one or the other of these elements are found in a case, estoppel does not ordinarily exist. 1 Story's Eq. Jur. 391; Brant v. Virginia Coal & Iron Co., supra; Hobbs v. McLean, 117 U. S. 567, 580, 6 Sup. Ct. 870, 29 L. Ed. 940; John Shillito Co. v. McClung, 2 C. C. A. 526, 51 Fed. 868, 876. Tested by the last-mentioned rule, the record fails to disclose any such conduct or acts on complainant's part as requires or justifies us in holding him estopped from foreclosing his mortgage. Moreover, it is essential, as a general rule governing equitable estoppel, that the party claiming to have been influenced by the conduct of another to his injury must himself have been ignorant of the true state of facts, and not have been guilty of negligence or want of due care in availing himself of opportunities open to him for ascertaining knowledge of such facts. Debenture Co. v. Hopkins, 63 Kan. 678, 66 Pac. 1015. "Equity will not assist a man whose condition is at-

tributable only to that want of diligence which may be fairly expected from a reasonable person." Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678; Burk v. Johnson, 146 Fed 209, 216, 76 C. C. A. 567. "It is also essential for its" (principle of equitable estoppel) "application with respect to the title of real property that the party claiming to have been influenced by the conduct or declarations of another to his injury was himself not only destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring such knowledge. Where the condition of the title is known to both parties or both have the same means of ascertaining the truth, there can be no estoppel." Brant v. Virginia Coal & Iron Co., 93 U. S. 337, 23 L. Ed. 927. See, also, Bloomfield v. Charter Oak Bank, 121 U. S. 135, 7 Sup. Ct. 865, 30 L. Ed. 923.

The record in this case discloses, and the master finds, that nothing was said between the parties at the time of the settlement between Clark and Lyster one way or the other about the mortgage in suit. Lyster testified that he made no examination of the land records to ascertain the condition of the title. From these facts it is clearly apparent that he did not rely upon any representation, act, or conduct of the complainant, and that he by his failure to examine the land records—the appropriate place for information, and one to which all persons are required to resort—was guilty of that negligence and indifference to his own rights which disentitles him to any equitable consideration. In the cases of Johnson v. Williams, 37 Kan. 179, 14 Pac. 537, 1 Am. St. Rep. 243, and Kuhn v. Nat. Bank, supra, the Supreme Court of his own state has so declared.

It is claimed that defendant, during the two months or more which elapsed after receiving Clark's quitclaim deed and before this suit was instituted, made extensive repairs upon the premises in question; that they were of little value before the repairs were made, and that their present value is largely given to them by defendant's expenditures. There is a sharp dispute about the value of the premises before the repairs were made, but, whatever be the fact in that particular, the defendant, from what has already been said, is the author of his own misfortune. It cannot be contended that complainant by dint of any word, act, suggestion, or influence so misled or induced him to spend any money on the premises, or to refrain from examining the land records to ascertain the truth about his title, as to estop him from asserting his lawful rights.

The decree below dismissing the bill cannot be sustained. It must be reversed, and the cause remanded to the Circuit Court with instructions to enter a decree in favor of the complainant; and it is so ordered.