**CHAPMAN, Commissioner of Insurance and Banking, et al. v. GUARANTY STATE BANK et al. (No. 10730.)***

(Court of Civil Appeals of Texas. Fort Worth. Jan. 5, 1924. Rehearing Denied Feb. 9, 1924.)

**1. States �kö=191(1)—Sovereign power not sued without consent.**

' The rule that the sovereign power may not be sued without its consent is general and of universal application.

**2. States �kö=191(1)—Suits against commissioner of banking and state bank board held not within rule prohibiting actions against state without its consent.**

An objection to an action by a bank against commissioner of banking and insurance and state bank board, based on alleged misrepresentation as to value of assets of a defunct bank, which induced plaintiffs to contribute to the assets of a bank organized to take over part of defunct bank's assets to recover back the moneys so contributed and privilege conferred, which to the extent of the contribution relieved the deposit guaranty fund, that the suit was one against the state without its consent, *held* untenable; the moneys thus sought to be recovered being wholly under the control of the banking board and the state not being directly and pecuniarily interested in the subject-matter of the suit and it being reasonable to say, in view of Complete Tex. Stat. 1920 or Vernon's Sayles' Ann. Civ. St. 1914, arts. 453, 461, 464, as to suits in matters relating to the depositors' guaranty fund, and article 473, authorizing application to the courts for relief in certain instances, that the state has at least impliedly given its consent to the suit.

**3. States ⊫=191(2)—Complaint and decree against state bank board held not to be personal as against individual members.**

In action by a bank and its directors to rescind contract between bank and state bank board by which bank took over assets of a defunct bank in hands of bank commissioner for liquidation and assumed certain liabilities on representation of state bank commissioner as to solvency of assets turned over, complaint and decree for plaintiffs *held* not to be against the *commissioner of insurance and banking and members of the state bank board individually,* rather than against them in their official capacity.

**4. Banks and banking ⊫=63½—State bank board held properly joined in suit against bank commissioner.**

In suit against state bank commissioner to rescind contract whereby plaintiff bank was induced to take over assets of a defunct bank and assume liabilities thereof to the extent of assets received, in absence of which arrangement the commissioner and state bank board would have been required to dispose of the assets, and, if proceeds thereof would have been insufficient to pay off certain debts of the defunct bank, resort to the state deposit fund would have been necessary control of which under Vernon's Sayles' Ann. Civ. St. 1914,

art. 446, was in the board, and article 487, providing that the estate shall have a first lien upon the assets of the bank for the benefit of the fund, *held*, that the state banking board was properly joined as defendant.

**5. Pleading ⊫=214(1)—On general demurrer, allegations of petition accepted as true.**

On general demurrer to petition, allegations therein are accepted as true and interpreted in light most favorable to plaintiff.

**6. Banks and banking ⊫=63½—Objection that sale of defunct bank's assets was judicial sale to be set aside only on direct attack not sustained.**

In suit against the commissioner of insurance and banking and state banking board to rescind, on the ground of fraudulent representations, a contract of sale whereby plaintiff assumed indebtedness of a defunct bank in consideration of assets thereof which were turned over to plaintiff bank and to recover the sum which had been contributed by plaintiff bank and which was applied in discharge of debts of the defunct bank, the sale by the commissioner having been approved by the district judge after hearing in vacation pursuant to Vernon's Sayles' Ann. Civ. St. 1914, art. 458, the plaintiff not being a party to the proceeding before the judge except as it was named as purchaser, and it being only by inference, if at all, that it could be said that the issue of fraud was presented or determined in the proceedings before the judge, *held*, that an objection to the suit on the ground that the sale was a judicial one, final in its character, which could not be set aside without a direct attack, would not be sustained.

**7. Judgment ⊫=948(1)—Ordinarily, res judicata must be pleaded.**

Ordinarily, the defense of res judicata must be pleaded to be available.

**8. Banks and banking ⊫=63½—Misrepresentations of banking commissioner held ground for rescinding sale of assets of defunct bank.**

In action to rescind contract of sale of assets of a defunct bank to plaintiff bank in the ground of fraudulent representations by defendant bank commissioner, whereby plaintiff was induced to assume certain liabilities of the defunct bank, *held*, under the evidence that misrepresentations by the commissioner of insurance and banking and bank examiner as to the solvency of assets, though innocently made, justified rescission of the sale.

**9. Banks and banking ⊫=63½—Findings that fraud of bank commissioner inducing purchase of assets of defunct bank not ratified not set aside.**

In suit to rescind contract of purchase of certain assets of a defunct bank for misrepresentation of commissioner of insurance and banking and bank examiner as to their value, *held*, under evidence, that the trial court's finding, that plaintiff's knowledge of the solvency of the makers of the notes transferred to plaintiffs was not such that the placing of additional cash in plaintiff bank by plaintiffs to replace notes which were later declared to

be worthless was ratification of the misrepresentations, would not be set aside.

**10. Banks and banking ⬚63½—Inability to completely restore statu quo held no defense to rescission of purchase from banking commissioner of assets of defunct bank.**

In action by a bank and its directors to rescind contract between bank and state bank board, by which bank took over certain assets of a defunct bank in hands of commissioner of banking and insurance and assumed certain indebtedness of the defunct bank, where a large proportion of the paper of the defunct bank was worthless and not available for application to debts of that bank assumed by plaintiff bank, which paper plaintiff offered to return, *held*, that the inability of plaintiff to return property received from defendants, the loss of which had been proximately caused by the fraud of defendant, would not defeat the action.

**11. Appeal and error ⬚187(3)—Objection on ground of defect of parties to suit against banking commissioner to rescind purchase of assets of defunct bank not sustained.**

Where plaintiff bank assumed certain liabilities of a defunct bank in hands of commissioner of banking and insurance in consideration of the turning over to it of certain assets of the defunct bank and thereafter plaintiff bank was taken over by the commissioner as insolvent, in action to rescind contract by which assets were taken over by bank and its directors against commissioner and state banking board, where creditors of plaintiff bank did not accept its obligation to pay off defunct bank's debts and there was no formal plea in abatement for want of proper parties failure to make plaintiff bank's creditors parties was not an available objection to judgment for plaintiff.

On Motion for Rehearing.

**12. Appeal and error ⬚1122(3)—Court of Civil Appeals need not make additional findings which are immaterial or evidentiary, or involve undisputed matters.**

It is not the duty of the Court of Civil Appeals to grant a motion for additional findings which are either immaterial, or evidentiary in character, or involve matters which are not disputed.

Appeal from District Court, Johnson County; Irwin T. Ward, Judge.

Action by the Guaranty State Bank and others against J. L. Chapman, Commissioner of Insurance and Banking, and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

W. A. Keeling, Atty. Gen., and Walace Hawkins, John C. Wall, John W. Goodwin, and Chas. L. Black, all of Austin, for appellants.

B. Gayle Prestridge, of Cleburne, and Bailey, Nickels & Bailey, Jed C. Adams, Grover Adams, W. B. Harrell, Chas. A. Rasbury, and R. L. Stennis, all of Dallas, for appellees.

CONNER, C. J. Pretermitting for the present statements not thought to be necessary to a disposition of the questions presented, the facts of this case, in outline, are that it appears that during 1922 the Traders' State Bank of Cleburne, Tex., then duly incorporated under the laws of the state of Texas, became insolvent, and the then acting and qualified commissioner of insurance and banking, Hon. Ed. Hall, closed its doors and took possession of all of its assets. Thereafter, as a means and process of advantageously liquidating the assets of the Traders' State Bank, another bank, to wit, the Guaranty State Bank of Cleburne, Tex., was duly organized and incorporated under the laws referred to by interested parties, whereupon the managing directors of the new bank and the commissioner of insurance and banking negotiated a sale of certain of the assets of the Traders' State Bank. The terms of the agreement then entered into may be briefly stated to be that the commissioner of insurance and banking deposited in the Traders' State Bank, out of the state guaranty fund, $200,000 in cash, and delivered the same to the Guaranty State Bank, together with the other assets of the Traders' State Bank, including several hundred thousand dollars of promissory notes or obligations then thought to be of their face value. The stockholders of the Guaranty State Bank also contributed to its funds $100,000 in cash, and later the sum of $25,000 to cover alleged worthless assets. The contract of sale thus outlined was approved by the district court of Johnson county upon the application of the commissioner therefor. It further appears that under this new arrangement the Guaranty State Bank operated something like one year, or until April 4, 1923, when in turn this bank also was declared to be insolvent, and was closed by Hon. J. L. Chapman, the then commissioner of insurance and banking, who took possession of all of its assets. Such further statements as are thought to be necessary will be made in connection with the subjects discussed.

This suit was instituted by the Guaranty State Bank and its present directors, who are named in the petition, against the present commissioner of insurance and banking and the state banking board of Texas, all of whom are named, alleging that the plaintiffs had been aggrieved by the closing of the Guaranty State Bank and by the action of the commissioner in taking possession of its assets, further alleging, in substance, that in entering into the contract of sale of the assets of the Traders' State Bank, as above indicated, the then acting commissioner of insurance and banking had fraudulently misrepresented the value of the promissory notes which, by that contract, had been acquired; that in fact several hundred thousand dollars of the obligations belonging to the Traders'

State Bank had been taken over by the Guaranty State Bank at their face value, but which proved to be worthless and uncollectable, by reason of which the Guaranty State Bank had become, if at all, insolvent, and, because of all of which, the plaintiffs sought to enjoin the commissioner of insurance and banking from liquidating and winding up the affairs of the plaintiff bank and to rescind the contract of sale hereinbefore referred to and to recover of the defendants the sum of $125,000, which had been contributed to the assets of the Guaranty State Bank, as before stated, and which it was alleged had been applied in discharging the indebtedness of the Traders' State Bank, or, in the alternative, that amount in notes of the Guaranty State Bank at their face value that had been taken to secure loans made by it.

The defendants, besides pleading general and special exceptions and general and special denials, presented other special pleas that will be noticed in the progress of our discussion.

The trial was before the district court of Johnson county without a jury, resulting in a judgment denying the injunction sought by plaintiffs, but awarding to them, in accordance with their prayer, a recovery in the sum of $125,000 in cash, with interest, etc., or, in the alternative, that amount in solvent notes in the hands of the commissioner taken by the Guaranty State Bank, and the defendants have appealed.

[1, 2] Appellants below, among other things, specially excepted to the plaintiffs' petition on the ground that it appeared to be a suit against the state of Texas and no consent of the state therefor had been alleged. The court overruled such exceptions, and appellants have by their second, fifth, and thirty-seventh assignments of error and propositions thereunder presented and urged the contention here. The rule that the sovereign power may not be sued without his or its consent is very general and it may be said to be of universal application by judicial authorities, and, if the petition of appellees present a case falling within that rule, it would follow, as a matter of course, that the court erred in overruling the exceptions and in failing to abate the suit. Appellants cite the following authorities as sustaining their contention: Auditorial Board v. Arles, 15 Tex. 72; Auditor v. Davies, 2 Ark. 494; McDowell v. Fuller, 169 Mich. 332, 135 N. W. 265; L. & P. Chemical Co. v. Board of Agriculture, 111 N. C. 135, 15 S. E. 1032; Lovett v. Langford, 47 Okl. 12, 145 Pac. 767; Lankford v. Platte Iron Works, 235 U. S. 461, 35 Sup. Ct. 173, 59 L. Ed. 316; 35 L. R. A. (N. S.) 243. These cases have all been examined by us, that is, all but the case of McDowell v. Fuller, 169 Mich. 332, 135 N. W. 265, which is not available, and we think it will be found that the cases examined are cases in which the state was, or was held to be, directly and pecuniarily interested in the subject-matter of the suit; but we think such a conclusion cannot be so affirmed upon the allegations of the plaintiffs' petition in this case.

The provisions relating to our Bank Deposit Guaranty Law are to be found in chapter 5, title 14, Complete Texas Statutes of 1920. This chapter provides that our incorporated state banks may protect their depositors by either availing themselves of the depositors' guaranty fund provided for in the chapter, or by the depositors' bond security system, also provided for. A bank board was created, composed of the Attorney General, a commissioner of insurance and banking, and the treasurer of the state. This board is given the control and management of the depositors' guaranty fund provided for, and given power to adopt all necessary rules and regulations in harmony with the chapter, for the management of the fund. A guaranty fund provided for is accumulated by the collection of a given per cent. of the daily average deposits of all associated state guaranty banks and payable to the board in cash. Article 449 of the chapter provides that—

The funds so accumulated "shall be by it [the board] deposited for safe-keeping only with the state treasurer, as bailee for the state banking board, and shall be paid out by the state treasurer on warrants drawn by the order of said board; and said fund shall never be diverted from the purpose specified in this chapter, nor shall it ever be considered state funds."

It thus appears that the money appellees sought to recover is wholly within the control of the state banking board, payable only upon that board's warrants, and that fund, by the specific terms of the law, may not be considered as a state fund. The state, therefore, can only be interested in that fund indirectly; i. e., by the interest that the state has in seeing that its laws, enacted for the protection of her people, are duly executed. Other provisions of the act undoubtedly place the control of the assets, other than cash, such as notes, etc., of an insolvent state bank in process of liquidation, in the hands of the commissioner of insurance and banking and the banking board, and which may be disposed of within the sound discretion of the board and commissioner, under the regulations of the act by sale or otherwise, and thus made to add to the guaranty fund. But nowhere in the law do we find any expression indicating that the state has a pecuniary interest in the promissory notes and other assets of the insolvent bank which has been operating under the state bank deposit guaranty law. In 36 Cyc. p. 916, in treating of the subject under consideration, it is said:

"It seems that the rule which forbids a suit against state officers because in effect a suit against the state applies only where the interest of the state is through some contract or prop-

erty right, and it is not enough that the state should have a mere interest in the vindication of its laws, or in their enforcement as affecting the public at large or the rights of individuals or corporations; it must be an interest of value in a material sense to the state as a distinct entity."

A number of cases are cited in a note in support of the text, including the case of Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014. That was a suit instituted against the Railway Commission of Texas and its members to restrain the enforcement of certain railway rates or tariffs which had been promulgated by the Railway Commission. By a decree of the lower court the International & Great Northern Railway Company was perpetually enjoined from putting or continuing into effect the rates or tariffs of the Railway Commission described in the complaint, and the Railway Commission and Attorney General of Texas from instituting any suits for penalties, etc. On appeal to the Supreme Court of the United States, in an opinion by Mr. Justice Brewer, it was held, in disposing of the contention that the suit was one against the state of Texas, that the state "in a pecuniary sense had no interest at all," that the only parties pecuniarily affected were the shippers and carriers, further stating:

"There is a sense, doubtless, in which it may be said that the state is interested in the question, but only a governmental sense. It is interested in the well-being of its citizens, in the just and equal enforcement of all its laws; but such governmental interest is not the pecuniary interest which causes it to bear the burden of an adverse judgment. Not a dollar will be taken from the treasury of the state, no pecuniary obligation of it will be enforced, none of its property affected by· any decree which may be rendered. It is not nearly so much affected by the decree in this case as it would be by an injunction against officers staying the collection of taxes and yet a frequent and unquestioned exercise of jurisdiction of courts, state and federal, is in restraining the collection of taxes, illegal in whole or in part."

It is true that in the later case of Lankford v. Platte Iron Works Co., the Supreme Court of the United States rendered a decision which may be said, upon a cursory examination, to support the contention of appellants on the subject. That was a case reviewing a decree of the District Court of the United States for the· Western District of Oklahoma, directing the state banking board of that state to repay a deposit in an insolvent bank out of the depositors' guaranty fund, or, in the alternative, to issue a certificate of indebtedness and levy an assessment to make up any deficit in the fund. It was held that the suit in effect was one against the state of Oklahoma and forbidden by the rule, but a reading of the decision will disclose that it was upon the theory that the state banking fund of Oklahoma under its laws belonged to the state, following decisions of the Supreme Court of Oklahoma to that effect. The language of the Oklahoma Supreme Court on that subject is:

"That the bank commissioner is a state officer has not been and cannot be questioned. That the depositors' guaranty fund, and the funds of a failed bank in the hands of a bank commissioner for the purpose of reimbursing the depositors' guaranty fund, is as much a fund of the state as the common school fund is also true."

See case of State ex rel. v. Cockrell, 27 Okl. 630, 112 Pac. 1000, quoted with approval in Lovett v. Lankford, 47 Okl. 12, 145 Pac. 767.

See, also, in opposition to appellants' contention, the cases of Herring v. Houston National Exchange Bank (Tex. Civ. App.) 253 S. W. 813; Middlekauff v. State Banking Board, 111 Tex. 561, 242 S. W. 442; Hall v. First National Bank (Tex. Civ. App.) 252 S. W. 828.

Moreover, we think it can be reasonably said that the state, at least by implication, has given its consent to suits of the character under consideration. It is provided in article 473 of chapter 5 of our Bank Deposit Guaranty Law (repealed since the judgment of the trial court) that—

"Whenever any such state bank, of whose property and business the commissioner has taken possession, as aforesaid, deems itself aggrieved thereby, it may, 'at· any time, apply to the district court, if in session, or to the judge thereof, if in vacation, of the district in which such bank is located and transacting business to enjoin further proceedings; and said court if in session, or the judge thereof, if in vacation, after citing the commissioner to show cause why further proceedings should not be enjoined, and hearing the allegations and proofs of the parties and determining the facts, may, upon the merits, dismiss such application, or enjoin the commissioner from further proceedings and direct him to surrender such business and property to such state bank."

The act requires the presentation of the claims against an insolvent bank taken in charge by him to be presented to the commissioner of insurance and banking, and it is enacted in article 464 of the chapter that—

"If the commissioner doubts the justice and validity of any claim, he may reject the same, and serve notice of such rejection upon the claimants, either by mail or by written notice personally served. An affidavit of the service of such notice, which shall be prima facie evidence thereof, shall be filed with the commissioner. The action upon the claim so rejected must be brought within six months after such service."

Article 464 does not designate the court in which the action shall be instituted, but some judicial action in a proper court is certainly implied. Other articles of the chapter also seem to imply court action. By article 453

the commissioner is given power to wind up the affairs of an insolvent bank "either through a receiver or through some competent person, who shall give bond as may be' required by the board, payable to the board, for the faithful performance of all duties imposed upon him." And it is enacted that "said bond may be recovered upon for the benefit of said guaranty fund, or any party at interest." By article 461 the·commissioner is given authority to "employ such counsel" and procure such expert assistance as may be necessary in the liquidation and distribution of the assets of the insolvent bank. These provisions, and perhaps others, of the act imply judicial action, while article 473, first quoted, in express terms declares that a state bank of whose property and business the commissioner has taken possession, which "deems itself aggrieved thereby," may apply to the district court for relief. The character of aggrievance in such cases is not limited by the statute and conferring, as it does, a benefit or privilege, is, we think, to be liberally construed, and, so construed, we think the complaint of the appellees in this case comes fairly within the privilege conferred by the statute. So that, on the whole, we are of the opinion that appellants' second, fifth, and thirty-seventh assignments of error and propositions thereunder should be overruled.

[3] By appellants' third, fourth, and fifteenth assignments of error it is complained that the court erred in rendering personal judgments against J. L. Chapman, commissioner of insurance and banking, and against C. V. Terrell, treasurer, and W. A. Keeling, Attorney General, and in favor of the directors of the State Guaranty Bank. Appellees, in substance, allege that after the investigation by the commissioner of insurance and banking and his assistants and employees, appellants decided to take charge of the Traders' State Bank of Cleburne and to close it and wind up its affairs because of its insolvency, and that appellants did take charge of said bank and close the same and entered into negotiations with appellees for the organization of a bank under the laws of Texas, with a view of taking over the solvent assets of said Traders' State Bank and assuming a like amount of the liabilities of said Traders' State Bank, and that said negotiations resulted in an agreement between said parties by the terms of which appellees would organize the Guaranty State Bank under the laws of Texas with a paid-in capital of $100,000, and would take solvent assets, including the banking house, furniture, and fixtures, valued at approximately $41,000, and the cash on hand and all good paper belonging to the said Traders' State Bank at par, and to assume a like amount of liabilities of said Traders' State Bank; that said commissioner of insurance and banking and his assistants and employees represented to appellees that they had taken all worthless or bad paper from the holdings of said Traders' State Bank and that the notes, warrants, and other claims, together with the other assets of said bank, would give to said Guaranty State Bank good and clean assets equal to or greater in value than the liabilities of the said Traders' State Bank then being assumed by said Guaranty State Bank, and that relying upon said representations and believing that said notes, warrants, and other claims theretofore belonging to said Traders' State Bank and then being transferred to said Guaranty State Bank by appellants were good and solvent and were worth their face value, the organizers of said Guaranty State Bank paid $100,000 into said Guaranty State Bank, entered into its organization and applied for and received the charter therefor under the laws of Texas, and received from appellants said banking house furniture, cash, notes, and other assets theretofore belonging to said Traders' State Bank, and immediately commenced operation in said city of Cleburne, and continued to do a general banking business there until on or about April 4, 1923, when said bank was wrongfully and unlawfully closed by said commissioner.

Appellees further allege that said Guaranty State Bank was conducted in an honest, faithful, and careful manner, and in compliance with the laws of Texas, and without loss and at a profit, and that appellees are, and at all times have been, ready and willing to replace with cash any notes received by it for loans made by it, and that said Guaranty State Bank since its organization had done nothing to depreciate the value of the assets received by it from appellants, and the closing of said bank by said commissioner was not because of any fault or failure on the part of the Guaranty State Bank; that relying upon the representations made by said commissioner and his assistants as to the solvency of the notes and other paper transferred to it by appellants, and having no information to the contrary, the board of directors of said Guaranty State Bank, at the instance of said commissioner, adopted a resolution authorizing the president of said·Guaranty State Bank to accept and execute the contract by which said assets were transferred to said Guaranty State Bank and by which said bank assumed the liabilities of said Traders' State Bank; that said commissioner represented to the officers of said Guaranty State Bank that he had caused to be placed in the assets of said Traders' State Bank the sum of $200,000 from the depositors' guaranty fund, and that he would take from the bills receivable of said Traders' State Bank bills receivable equal to $313,000, which would include all of said bills receivable that were not good, and that after withdrawing said amount of bills receivable the remaining bills receivable belonging to said

Traders' State Bank were then good and clean assets and were worth their face value.

Appellees further allege that the greater part of the bills receivable were then worthless, and appellees were deceived by the aforesaid representations made by said commissioner and his assistants, and that said Guaranty State Bank would not have executed said contract had said bank or its officers known the truth about said assets; that the liabilities of said Traders' State Bank which said Guaranty State Bank agreed to assume aggregated more than $500,000, and were liabilities for which appellants were liable to pay out of said guaranty fund, and which appellants would have been required to pay had not said Guaranty State Bank been induced by said misrepresentations to assume payment of said liabilities. Appellees further allege that a few months after the organization of said Guaranty State Bank said commissioner represented to said bank that further investigation by him and his assistants had disclosed the worthless condition of part of the paper which had been transferred by appellants to said Guaranty State Bank, and said commissioner insisted that the stockholders of said Guaranty State Bank put into said bank the further sum of $25,000 cash to take the place of said worthless paper; that said stockholders protested against putting into said bank that sum of money to take the place of any worthless paper which had been transferred to said bank by appellants, insisting at the time that the state banking board should take care of any of said paper that might be found to be worthless, but that upon the assurance of said commissioner that there was no other bad paper in said assets, and that there would be no further payment demanded from said stockholders to take the place of any of said paper that might be found to be worthless, and in order to have no friction with said commissioner and to avoid any possible complications that might result from refusing, said stockholders then deposited in said Guaranty State Bank the further sum of $25,000 cash, and said bank continued to operate until thereafter closed by the commissioner on April 4, 1923.

Appellees further allege that but for the fraud perpetrated upon said Guaranty State Bank by the transfer of said worthless notes in consideration of the assumption by said Guaranty State Bank of a like amount of liabilities, said Guaranty State Bank is and would be solvent, and that appellees are entitled to a rescission of said contract of sale, and that appellants should be required to take back all the assets received by said Guaranty State Bank from appellants and should be required to release to appellees said sum of $125,000, put into said Guaranty State Bank by the stockholders of said bank or a like amount of notes received by said Guaranty State Bank on loans made by it, or, in the alternative, appellants should be

required to take back all notes and other paper transferred to said Guaranty State Bank by appellants, and which at the time of said transfer was not good or not worth face value, and said Guaranty State Bank should be credited with a like amount of liabilities assumed by it, and said Guaranty State Bank should be permitted to open its doors and resume business without being required to pay any assessment by reason of any loss on account of the worthless or bad condition of any of the notes or paper received by it from appellants. Appellees further allege that appellants have wrongfully taken possession of said Guaranty State Bank, and unless prevented from so doing will dispose of and appropriate to the liabilities of said Traders' State Bank the sum of $125,000 put into said Guaranty State Bank by its stockholders, and which belongs to said Guaranty State Bank and to its stockholders, and which is not liable for the debts of said Traders' State Bank nor for the uses to which appellants are proceeding to apply same, and that such acts of appellants will destroy said Guaranty State Bank and deprive its stockholders of their assets and business to their damage in the sum of $200,000; that they are entitled to have appellants enjoined from proceeding further toward the winding up of the affairs of the Guaranty State Bank, and to compel appellants to surrender said bank and its assets to its officers. Appellees pray for an injunction and upon final hearing from judgment against appellants for a rescission of the aforesaid agreement and contract, and for recovery from appellants said sum of $125,000 in cash, or the notes therefor taken by said Guaranty State Bank on loans made by it, and, in the alternative, for judgment requiring appellants to take back all assets transferred to said Guaranty State Bank as aforesaid and which were not good or worth their face value and allow said Guaranty State Bank credit for a corresponding amount on the liabilities of said Traders' State Bank assumed by said Guaranty State Bank and permit said Guaranty State Bank to resume its business, and for general relief.

The judgment of the court is in favor of the Guaranty State Bank of Cleburne and the directors of said bank and against the commissioner of insurance and banking and the state banking board for the sum of $125,000, and provides that the said sum and interest thereon may be satisfied and discharged in full by delivery to appellees within 60 days from the time this judgment becomes final, notes of the face value of said judgment which were received by said Guaranty State Bank for loans made by it, and provides that if such notes owned by said Guaranty State Bank, when taken over by said commissioner on April, 4, 1923, are not sufficient in amount to satisfy the judgment, the balance, if any, may be satisfied by de-

livering to appellees other notes then owned by said Guaranty State Bank and which were classified as good by the committee theretofore appointed by said commissioner to examine and classify said notes after the closing of said bank.. This judgment denies appellees' application for an injunction and permits appellants to remain in possession of said Guaranty State Bank and its assets, and to administer the same as by law provided, subject to the judgment. The judgment of the trial court relative to the rescission of said contract of sale of the assets of the Traders' State Bank is as follows:

"It is further ordered and decreed by the court that said contract by and between the commissioner of insurance and banking, sold and transferred to said Guaranty State Bank certain assets of said Traders' State Bank in consideration of the assumption by said Guaranty State Bank of the liabilities of said Traders' State Bank, be and the said contract is hereby rescinded and shall be held for naught."

The judgment further provides that within 60 days from the time the judgment shall become final appellees shall place appellants in statu quo by returning to appellants any assets received by said Guaranty State Bank from said commissioner of insurance and banking on April 15, 1922, which were not theretofore surrendered by appellees to said commissioner of insurance and banking, or renewals thereof where any part of said assets were bills receivable which have been renewed; or cash where any of said assets were by said Guaranty State Bank in due course of business collected or converted into cash, or bills receivable taken by said Guaranty State Bank in due course of business from any of said cash assets, less any sum or sums paid by said Guaranty State Bank on any of said liabilities of said Traders' State Bank assumed by said Guaranty State Bank, and any lawful debts owing by said Guaranty State Bank and growing out of said contract, and less any assets that may have been lost without fault on the part of appellees, after said bank was taken over by appellants.

Construing the pleadings and judgment as a whole, we do not think it can be said that either the complaint or the decree is against the commissioner of insurance and banking and the members of the banking board individually. As it seems. to us, the declaration is against these parties in their official capacity and not as individuals. Indeed, appellees in their brief say this:

"Appellees are not seeking personal judgments against the court or the agent of the court or a particular person who happens to be commissioner of insurance and banking or the representative of the state banking board at the time of the institution of the suit and the rendering of the judgment, but is seeking a rescission of the contract rendered void by fraud and is seeking to recover their property from those who are withholding this property from appellees under this fraudulent contract."

It would seem further that all doubt, if any, as to the effect of the judgment in this respect could have been removed by a proper motion in the court below to have the judgment reformed; but we fail to find that any suggestion of the kind has been made either in the court below or in this court. We also note that there is no contention in behalf of. appellants that the Guaranty State Bank, as a corporation, has been dissolved by any final decree of dissolution or otherwise, and we need not cite articles of the statutes which authorize corporations in this state to maintain and defend judicial proceedings and that enact "that the directors' or trustees shall have the general management of the affairs of the corporation." If therefore it should be finally determined that the Guaranty State Bank is not insolvent and should be permitted to continue in business as the plaintiffs in the suit sought, the judgment in its favor for reimbursement on account of the worthless notes of the Traders' State Bank would be proper. If, on the other hand, it should be finally determined as the court below decreed that the Guaranty State Bank is insolvent and hence the corporation dissolved under the terms of paragraph 6 of article 1205, chapter 10, Rev. Statutes, then the plaintiff directors, by the next article (1206), have been given "full power to settle the affairs, collect the outstanding debts, and divide the moneys and other property among the stockholders, after paying the debts due and owing by such corporation at the time of its dissolution," and the judgment in their favor would be correct, and in such event it would be immaterial that the judgment was also in favor of the dissolved corporation. Perhaps the judgment should now be reformed so as to more specifically show that it is against appellants in their official capacity only and in favor of the plaintiff directors of the Guaranty State Bank, and we would feel no hesitation in so reforming the judgment if appellants so desire. At all events, we do not think we would be justified in reversing the judgment, as contended for in the assignments under consideration.

[4] By assignments 6, 7, and 8, appellants assign error to the action of the court in overruling the general demurrer to the plaintiffs' petition, now contending that the commissioner of insurance and banking, J. L. Chapman, and the state banking board have been improperly joined in the suit, and that the petition shows no cause of action against the state banking board. Under the provisions of the Bank Deposit Guaranty Law, the commissioner of insurance and banking is fully authorized to close and take possession of the assets of a state bank found to be insolvent, and by article 487, Rev. Statutes, it is expressly provided that—

The state shall have, "for the benefit of the depositors' guaranty fund, a first lien upon all assets of such bank or trust company * * * which lien shall attach and be in force from the time such bank or trust company is legally closed, upon all the property and assets then in possession of such bank or trust company," etc.

Article 446 provides that—

"Said board shall have the control and management of the depositors' guaranty fund hereinafter provided for, and shall have the power to adopt all necessary rules and regulations in harmony with this chapter, for the management of said fund. Said board * * * shall have the power of the regulation, control and supervision of all state banking corporations and trust companies as hereinafter provided in this title."

[5] Accepting the allegations of the petition as true and interpreting it in the light most favorable to plaintiffs, as is the rule when objected to on a general demurrer, we fail to see how the plaintiffs could be effectively given the relief they seek without joining the commissioner of insurance and banking together with the other members of the banking board. The petition, in one of its phases at least, seeks to have restored to the assets of the Guaranty State Bank the face value of the worthless notes of the insolvent Traders' State Bank, in consideration of which the Guaranty State Bank assumed liabilities equal to the face value of such worthless notes. As developed by the petition, the organization of the Guaranty State Bank and the sales to it of the assets of the insolvent Traders' State Bank was intended by the commissioner of insurance and banking as a means of protecting the Guaranty State Fund, for, in the absence of such an arrangement, the commissioner of insurance and the banking board would have been required to dispose of the assets of the Traders' State Bank, and if the proceeds of such disposition were insufficient to pay off the noninterest-bearing depositors of the Traders' State Bank, resort must have been to the deposit fund in the custody of the state treasurer, which could only be withdrawn upon the warrant of the banking board. The banking board, according to the allegations of the petition, must have joined and lent its aid in furtherance of the purpose and in effecting the sale, for it is alleged that the $200,000 in cash from the guaranty fund was deposited with the insolvent Traders' State Bank, which, with other assets of that bank, was transferred to the Guaranty State Bank. The duties and powers of the commissioner of insurance and banking and the state banking board, of which the commissioner is a member, are so closely related and interdependent that we think they were properly joined in the suit, and that if, by means of the fraudulent representations alleged, the worthless obligations of the insolvent Traders' State Bank were unloaded, so to speak, upon the Guaranty State Bank in the manner alleged, thus largely increasing the liabilities of the latter bank, we find no satisfactory reason for holding that a cause of action was not stated against the banking board. The assignments referred to are accordingly overruled.

[6, 7] By appellants' tenth to fourteenth assignments of error, inclusive, it is insisted, in substance, in various forms, that the sale by the commissioner of insurance and banking to the Guaranty State Bank, which plaintiffs sought to set aside, was a judicial sale, final in its character, and which could not be set aside without a direct attack thereon and with a prayer therefor, citing, among others, the cases of In re Third National Bank (D. C.) 4 Fed. 775; Laurel Oil & Gas Co. v. Gas Co., 165 Fed. 162, 91 C. C. A. 196; Files v. Rankin, 153 Fed. 537, 82 C. C. A. 491; Blackburn v. S. R. Co. (C. C.) 3 Fed. 689; F. & M. Bank v. Ry. Co. (Tex. Civ. App.) 36 S. W. 131. The questions so presented have not been in our minds entirely free from difficulty, but we have concluded that the assignments named should be overruled. Assuming for the purpose of the argument only that this suit does not constitute a direct attack on the sales in question, we yet do not think it can be said that the objections urged are clearly presented on the face of the plaintiffs' petition, and hence that the court erred in overruling the demurrers mentioned in the tenth and eleventh assignments; for, upon the face of the petition, no reference is made to any action of the court in approving or disapproving the sale to the Guaranty State Bank. Such conclusion arises, if at all, only by inference. It does appear, however, in the evidence that after the terms of the sale had been agreed upon between the commissioner of insurance and banking and the directing officers of the Guaranty State Bank, the commissioner presented an application to the district judge, which, by him, was set down for a hearing on April 15, 1922; that a waiver of service of the notice of hearing was executed by the Traders' State Bank of Cleburne; that upon such hearing the district judge of Johnson county, in vacation, approved the sale and authorized the commissioner to make it; that thereafter on the same day, to wit, April 15th, the commissioner completed the sale and reported his action to the district judge and the report was by said judge approved, all in accordance with article 458 of the Bank Deposit Guaranty Law, which reads:

"Upon the order of the district court, if in session, or the judge thereof, if in vacation, of the county in which such state bank was located and transacting business, the commissioner may sell or compound all bad or doubtful debts, and, on like order may sell the real or personal property of such state bank, on such terms as the court shall direct."

We will first observe that the plea seems to be in the nature of res adjudicata, and appellants have not presented the question by a plea of that character, which is ordinarily necessary in this state, to make the question available as a defense. We will further observe that the judicial power in this state is vested by the Constitution in courts and in judges only when authorized, and it may possibly be questioned whether the act of the district judge approving in vacation a sale by the commissioner of insurance and banking is a judicial act, or, if so, whether, under the terms of the Constitution, the Legislature could so empower him. But the questions presented in these suggestions have not been urged, and we do not undertake to decide them; but passing such questions without discussion, it is to be further noted that at the time of the commissioner's application and of the judge's approval of the sale, no suit was pending in the district court, nor does it appear that the Guaranty State Bank was a party to the application of the commissioner, or had notice of the application, or appeared upon the hearing thereon. The only connection that the Guaranty State Bank appears to have had with these proceedings is that it was named in the application, contract, and order of approval as the purchaser. Furthermore, it is only by inference, if at all, that it can be said that the issue of fraud, upon which the plaintiffs' present action is founded, was presented or determined in the proceedings before the district judge referred to, for the facts relating to this issue were not then known to the plaintiffs. Hence the plaintiffs, under the rule as announced in the case of Moore v. Snowball, 98 Tex. 16, 81 S. W. 5, 66 L. R. A. 745, 107 Am. St. Rep. 596, are not to be denied in this suit from having the issue of fraud determined and the results judicially declared. By reference to the cases above cited and relied upon by appellants as showing that the sale under consideration was a judicial one and conclusive, it will be seen that they were all cases where by regular procedure the court, as distinguished from a named judge, had lawfully acquired jurisdiction of the subject-matter involved, as in the case of an administration or a receivership, and where the sale in fact was by the court and not by the administrator or receiver, except as an arm of the court. But here, under the terms of the law, it is the commissioner of insurance and banking who has been given jurisdiction over the assets of an insolvent bank and who, in fact, negotiates and makes the sale subject only to the approval of the proper judge or court; and it seems to us that in these respects this case is distinguishable from the cases referred to.

We wish to further add that the facts alleged in plaintiffs' petition suggest the theory that the action was not one alone to set aside a judicial sale, but one seeking to affirm the sale and require the commissioner and banking board to take back or give credit to the Guaranty State Bank for a mass of worthless notes, and to that extent relieve the bank from the obligation assumed under the contract to discharge the liabilities of the insolvent Traders' State Bank, for the plaintiffs made no offer to return the real estate, the liquid assets, or the solvent notes acquired by it in the sale, but, on the contrary, sought to continue its business as a bank and presumably utilize its assets, after receiving such credit, in discharge of its obligation to pay the indebtedness of the Traders' State Bank, and if the judgment be carefully considered, it is doubtful whether the court's decree, in substance, goes beyond this, for it continues the commissioner in possession of the Guaranty State Bank and its assets, which includes the power, of course, to utilize all of its assets in payment of its indebtedness, including those of the Traders' State Bank not declared to be worthless, and possibly including, as an asset, the decree in this case in favor of the plaintiffs for a recovery of the stated amount in money, dependent on the final classification of the character of this suit and the determination of whether the judgment should be for the plaintiff bank or for the plaintiff directors as trustees for its creditors, or possibly for the individual plaintiffs as damages for fraud. Without further discussion, however, we conclude that, on the whole, the assignments 10 to 14, inclusive, should be overruled.

[8] By the sixteenth to the twenty-second assignments of error, inclusive, it is urged that there is no sufficient evidence that Ed Hall, the then commissioner of insurance and banking, and W. A. Sandlin, bank examiner, made representations to the Guaranty State Bank of the value of the assets of the Traders' State Bank, or, if so, that such representations were mere expressions of opinion, or traders' talk, and that at least two of the parties to the contract, to wit, J. G. Dunlap and H. L. Wallace, knew of the value of the property, and that other parties to the contract made an investigation for themselves, and that the plaintiffs did not act upon the alleged fraudulent representations, but acted upon their own judgment. We have examined the evidence as carefully as we have been able to do, but because of its volume we will not undertake to set it out in full. In substance, among other particulars not necessary to mention, Mr. Sibley testified: That at the time of the failure of the Traders' State Bank he was not interested but was approached by Mr. Hall, the then commissioner, who asked him if he was "interested in trying to work out the Traders' State Bank situation"; that he replied that he was not; that Mr. Hall then further asked him if he would become interested if the "bank could be bought on a clean basis"; that he (Sibley)

"had·no personal knowledge of the kind or about the solvency of these notes," referring to the notes of the Traders' State Bank, and that he refused to go over the papers unless the state bank examiner was there to go over the affairs with him and give his knowledge thereof. That Mr. Sandlin said "all of these notes he was showing were good except $79,-000 that he had classified as losses." That he (the witness) had no further conversation with Mr. Sandlin or Mr. Hall until the night the trade was made at Cleburne. That he did not read the contract or go over the notes. That Mr. Hall told him his money was "absolutely safe and the assets of the bank were good and clean." That Mr. Hall said that "the character of paper that was left in the bank after taking out the amount which, under the contract, he was to take out, was good, and that we were getting a good, clean bank"; that he was one of the organizers of said Guaranty State Bank and one of its directors, and that he accepted the transfer of assets and the assumption of the liabilities of the Traders' State Bank according to the terms of the contract. That he relied on the banking department, through the banking commissioner and his assistants, as to the nature of those assets. That he would not have made his investments unless he thought the assets were good. That the report of Mr. Sandlin of the condition of the Traders' State Bank at the close of its business, and which had been introduced in evidence by the appellants, was not the report Mr. Sandlin exhibited to him. That the copy of the report shown the witness classified about $79,000 of paper of the Traders' State Bank as losses, while the report introduced in evidence showed approximately $400,000 of loans listed and criticized. This witness further testified that in April, just before the Guaranty State Bank closed, the commissioner claimed that something like $200,000 or $300,000 of paper ought to come out of the bank; that the paper referred to was that which had been transferred from the old Traders' State Bank to the Guaranty State Bank; that he knew of no loans made by the Guaranty State Bank or paper received by it representing such loans that was afterwards objected to or pronounced bad by the bank examiner; that the complaint was not on any business taken in by the Guaranty State Bank, but on the old paper received by the commissioner; that the officers of the Guaranty State Bank in their negotiations with the commissioner offered to take care of all the paper the Guaranty State Bank had received on loans made by it; that at the time he traded with Mr. Hall for the notes of the Traders' State Bank he had no personal knowledge as to the solvency of the notes or any of the makers, but relied strictly upon the representations made to him by the commissioner and his assistants.

Gus Ayers testified in part that he lived in Dallas and was one of the organizers of the Guaranty State Bank, but sold his stock soon after its organization; that he was present in the Traders' State Bank room when the Guaranty State Bank was organized; that Mr. Hall, commissioner of insurance and banking, was present, and, addressing Mr. Sibley, made the statement in the presence of all the organizers that, "You have bought a good bank, and a clean bank, and you have the best opportunity in the country"; that this statement was made while the papers were being prepared and before the approval of the contract by the district judge.

Hugh L. Wallace testified: That he lived in Fort Worth, where he was in the wholesale and retail coal and wood business; that he was in the same business in Cleburne and was·connected with the Traders' State Bank before it was closed; that he had been a director about 15 months, but was not an officer and did not serve on any financial or credit or loan committees while he was such a director. That he had nothing to do with it and was not familiar with the notes and bills receivable held by that bank on April 15, 1922, the time the bank was closed. That he was present at a conference in the Federal Reserve Bank in Dallas on Sunday, April 9, 1922, when Mr. Sibley was asking Mr. Sandlin for his report as to the condition of the bank. That Mr. Sandlin had been working on the Traders' State Bank situation since March 27th. That Mr. Sandlin told Mr. Sibley that his report would show the losses of the bank and that their surplus and undivided profits were all gone and their capital stock impaired. That the capital stock was $75,000 and the surplus and undivided profits should have been about $58,000. That Mr. Sandlin stated, just before going to the Reserve Bank on that morning, that "if·Mr. Hall would place $100,000 out of the guaranty fund as a deposit in said bank and let him manage the bank he didn't think it would cost the guaranty fund any money and he was sure it wouldn't cost over $100,000." That later he reported this statement to Mr. Hall. That he was present at the conference with Mr. Hall and others in the Southwest National Bank, and that Mr. Sibley told Mr. Hall that "he would consider this Traders' State Bank proposition if they would promise to absolutely clean the bank, and Mr. Hall said he would do that if they could agree on the terms." That he was present in Cleburne before the transfer was made to the Guaranty State Bank. That Mr. Hall said "he was going to deliver to us the cleanest bank in the state of Texas. * * * That he was delivering to us the best bank in the state of Texas, and·we had a wonderful opportunity." That Mr. Sibley said he was taking the bank from Mr. Hall as a man to man agreement, and that he would do as they agreed. That they did not all have the same opinion as to the amount of the losses

of the Traders' State Bank. That Mr. Ramsey thought we had a very slight loss; Mr. Bishop and others a little more; that the witness and Mr. Dunlap thought the losses were about $90,000, this opinion being formed from what had been told him. That there were notes held by the Guaranty State Bank which had been received from the commissioner out of the assets of the old Traders' State Bank and renewals thereof that were worthless at the time the Guaranty State Bank was closed on April 4, 1923, to the amount of $350,000, some of which were worthless April 15, 1922. That there "was no change in the condition of things from April 15, 1922, to April 4, 1923, that would make those notes worth less at the latter date; they should have been worth more according to crop conditions and prices. There was no change in conditions that would make good notes worth less in 1923 than in 1922. A lot of this paper, when transferred to the Guaranty State Bank, was not due, and did not become due until the fall of 1922. The condition of the country was such that a note should have improved in October, November, and December from what it was in April." That approximately $313,000 of the paper of the Traders' State Bank was to be taken out by the commissioner under the contract of sale, but at the time of the transfer it was left with the other paper and delivered to the Guaranty State Bank. That the officers of the Guaranty State Bank went over the paper and picked out $298,000 of bad paper, and perhaps some overdrafts that were to be counted, making a total of $313,-000. Some time in the summer of 1922 the bad paper to the amount of $313,000 was turned over to the commissioner and never turned back to the Guaranty State Bank.

J. R. Nail testified in part and in substance that he had lived in Cleburne for 40 years or more, and for some 18 months prior to May, 1923, had been working for the Federal Reserve Bank in the collection of paper held by them through the failure of the National Bank of Cleburne, which failed in October, 1921; that his work in this respect gave him some idea as to the solvency of the paper and the makers who resided in the community; that he was living in Cleburne when the Traders' State Bank was closed and the Guaranty State Bank was organized; that he had examined or inspected paper held by the Guaranty State Bank which came to it from the commissioner of insurance and banking out of the assets of the old Traders' State Bank; that this paper, or renewals thereof, was held by the Guaranty State Bank when it closed on April 4, 1923; that he considered some of that paper worthless at that time; that the estimate of the amount of that paper that was worthless was $400,000 or $500,000; that some of this paper had been in the bank for years; some could not pay and some where not disposed to pay

if they could; that the National Bank of Cleburne failed October 17, 1921, and the banking conditions in Cleburne had been bad on account of these failures; that the people had not recovered from the influence of them, and the general conditions had not improved up to April 4, 1923, except that there had been a good crop and a good liquidating period last fall; that the report of the bank examiner of date March 31, 1922, showed more than $200,000 considered as losses and extremely hazardous and doubtful, and approximately $400,000 listed and criticized, and those not listed and believed to be hazardous and doubtful estimated at $50,000.

Reese Allen, one of the appellees, testified in part and in substance that he had lived in Wichita Falls and had been living there for 20 years; that he was one of the organizers of the Guaranty State Bank of Cleburne and knew Mr. Hall, the commissioner of insurance and banking at that time; that before the organization of the bank he went to Austin and talked to Mr. Hall about this trade for the old Traders' State Bank; that what they were trying to do was to save this bank; that Mr. Hall and the witness could not agree as to what it would take to save the bank; that Mr. Hall finally convinced him that by charging off the capital and surplus of the old Traders' State Bank and the Guaranty Fund paying in $200,000 that it would be a clean bank, and he left him with that understanding; that he told Mr. Hall that he would put in $100,000 on deposit in the bank, or would take 25 per cent. of the capital stock of a clean bank, if they would clean the bank, and he assured the witness that $200,000 put in there and by charging off the capital and surplus would make a clean bank. He (the witness) claimed that he ought to have $300,000 taken out, but he (Mr. Hall) finally convinced the witness that $200,000 would clean the bank, and the bank was organized on that basis. That he relied upon what Mr. Hall had stated about the condition of that bank when he put his money into it and helped to organize the new bank; that the witness had never had any connection with the Traders' State Bank of Cleburne and was never interested in it financially or in any other way; that Mr. Hall told him that with $313,000 of paper taken out of the bank that it would be one of the cleanest banks in Texas.

J. G. Dunlap, one of the appellees, testified in part and in substance that he had lived in Cleburne for some 18 years and was the principal of the Cleburne High School during that time; that he was a director in the old Traders' State Bank a little more than a year, but was not an active officer therein; that he did not serve on any loan committee or finance committee or have anything to do with making the loans; that he was a director in the Guaranty State Bank; that before it was organized he attended

some of the conferences between the directors of the old Traders' State Bank and other parties in Dallas; that just prior to these conferences Mr. Sandlin had made an examination of the Traders' State Bank; that he was several days in making the examination; that at one of these conferences Mr. Sandlin stated that the amount of $200,000 was too much to put up and that they were undertaking to skin the department. He said that if the department would give him $100,-000 and put him in charge he thought he could clean the bank and there would be no further losses; that he was present in the directors' room of the Traders' State Bank on the night of April 15, 1922, when the old Traders' State Bank was closed and the Guaranty State Bank's charter was delivered; that while the papers were being arranged and the dates were being written in, Mr. Hall said: "You now have a clean institution and one of the best opportunities I know of in Texas."

Of the plaintiffs and organizers of the Guaranty State Bank who testified, but two, J. G. Dunlap and H. L. Wallace, were directors of the old Traders' State Bank, and their testimony authorizes the conclusion that they were not familiar with the value of the assets of that bank. The others, to wit, S. W. Sibley, Reese Allen, B. Taylor, Gus Ayers, and W. F. Wallace, organizers and directors of the Guaranty State Bank, testified that they had no connection with the old Traders' State Bank and knew nothing of the value of its assets. True, there was some testimony tending to show that one or more of the organizers and directors of the Guaranty State Bank made some investigation and perhaps consulted with others as to the condition of the Traders' State Bank, but we think without doubt that the testimony is such as to authorize the conclusion that must be imputed to the court below that the plaintiffs in making the purchase of the assets of the Traders' State Bank were not relying alone upon their own information and investigation, but, on the contrary, were relying mainly upon the representations made by Mr. Hall, the then commissioner, and Mr. Sandlin, the examiner. If so, they cannot be denied the right of recovery merely because they also relied in part upon information and investigation of their own. See Buchanan v. Burnett, 102 Tex. 492, 119 S. W. 1141, 132 Am. St. Rep. 900; Merle v. Andrews, 4 Tex. 200; Labbe v. Corbett, 69 Tex. 503, 6 S. W. 808.

It is to be borne in mind that it is reasonable to suppose that the statements and representations of experts on the subject, such as the commissioner of insurance and banking and the bank examiner, would probably receive greater weight than the opinions of others not so well informed. It is true that both Mr. Hall and Mr. Sandlin testified and specifically denied making the represen-

tations attributed to them, but this fact merely presents a conflict in the testimony which it was the province of the court below to determine, and which he did determine in favor of the plaintiffs.

Appellants contend that the opinions and statements of Commissioner Hall and Examiner Sandlin were but mere expressions of opinion and traders' talk, not amounting to representations of fact. In the case of I. & G. N. Ry. v. Shuford, 36 Tex. Civ. App. 251, 81 S. W. 1189, affirmed 98 Tex. 622, and the case of Riggins v. Trickey, 46 Tex. Civ. App. 569, 102 S. W. 918, affirmed 102 Tex. 590, it is held that an expression of an opinion amounting to an affirmation of fact is a representation of fact, and, if untrue, constitutes fraud and grounds for a rescission or for damages. In the case of McCall v. Proal, 48 N. Y. Super. Ct. 403; McCall v. Sullivan, 1 White & W. Civ. Cas. Ct. App. § 1; Mitchell v. Zimmerman, 4 Tex. 81, 51 Am. Dec. 717, and Western Piano & Organ Co. v. Anderson, 45 Tex. Civ. App. 513, 101 S. W. 1061, it is held, in effect, that where misrepresentations were made as to the solvency of third parties the person making the misrepresentations is liable, if by virtue of such misrepresentation he received a consideration. It cannot be doubted that the commissioner of insurance and banking and the banking board, both officially received a consideration for the transfer of the worthless notes in controversy to the Guaranty State Bank. They were sold for their full face value, and the liability of the Guaranty State Bank for the debts of the Traders' State Bank was based upon such assumption, and to the extent of that assumption the guaranty fund was thereby relieved. A statement exhibited in the record tends to show that a short time before the Traders' State Bank was closed it had deposits of approximately $900,000 and approximately $30,-000 of other funds in cash. Under the law the depositors' guaranty fund became liable for these deposits less the cash on hand.

Appellees in their brief state, and the statement is not denied, that, in addition to the deposits above named, the Traders' State Bank had on hand notes to the amount of approximately $1,000,000, of which one-half were worthless, and for which the depositors' guaranty fund was liable, and they contend that there is no rule or condition which would distinguish this case from any other case of fraud; that the depositors' guaranty fund had this enormous loss on April 15, 1922, whether it was known or not, and that the evidence will not justify the shifting of this loss to the appellees, even though the misrepresentations made by the commissioner and his representatives as to the solvency of these assets were innocently made and made in perfect good faith. With this contention we feel that we must agree. We according-

ly, as above stated, overrule assignments of error 16 to 22, inclusive.

[9] Because of the length of this opinion, we will but briefly notice the remaining questions. Error is assigned to the judgment on the ground that the evidence shows that the plaintiffs, after the discovery of the fraud alleged, ratified the sale, but continued in business and hypothecated the property of the old Traders' State Bank that it had acquired thereby. The evidence relating to the subject has been examined. It shows, in substance, that the active participants in the negotiations culminating in the sale and the organizers of the Guaranty State Bank had at the time but little personal knowledge of the solvency of the makers of the notes of the Traders' State Bank transferred to the plaintiff bank; reliance upon the character of these notes being mostly placed upon the statements of the then commissioner of insurance and banking and the bank examiner. That after the State Guaranty Bank began its operations, Mr. Caldwell, imported from a distant county, took charge of its affairs. He was without definite personal knowledge of the character of the thousands of dollars of notes received from the Traders' State Bank, many of which did not mature until the fall of the year 1922. In September of that year, the present commissioner, Mr. Chapman, directed an examination of the plaintiff bank. This examination resulted in a demand by Mr. Chapman, as the new commissioner of insurance and banking, that the owners of the bank place therein cash to the extent of $50,000, or rather $25,000, and the appropriation of a like sum of the undivided profits to cover some $50,000 of the Traders' State Bank notes which he then declared to be worthless. The plaintiff stockholders protested against doing this, but finally, upon the assurance of the commissioner that upon this being done the bank would be entirely clean and solvent, they complied with the request, made the deposit and apportionment so requested in order to be able to continue business and avoid conflicts and friction with the commissioner of insurance and banking. We cannot say that the evidence is of that uncontradicted character which requires us to set aside the trial court's findings that there was no ratification because of this transaction, nor do we think the mere fact that in the progress of the business of the State Guaranty Bank some of its assets had been pledged for credits necessarily amounts to a ratification of the fraud found to have been committed by the trial court.

In Ingram v. Abbott, 14 Tex. Civ. App. 583, 38 S. W. 626, affirmed in 93 Tex. 664, it is held that it is incumbent upon the party claiming the ratification of a fraudulent contract to establish clearly that such was the other party's intention after knowing all the material facts, before a court of equity should deny him relief.

In the case of Galveston Ry. Co. v. Cade (Tex. Civ. App.) 93 S. W. 124, and 100 Tex. 37, 94 S. W. 219, it is held that where one injured through negligence of another is induced by fraudulent representations to release the other from liability, delay after discovery of fraud does not estop him from rescinding the release and bringing action for his injuries at any time within the time of limitations, where the delay does not operate to the prejudice of the defendant.

In the case of Cabaness v. Holland, 19 Tex. Civ. App. 383, 47 S. W. 379, writ of error refused 93 Tex. 680, it is held that a demand for rescission is not required if soon after the discovery of fraud complaint is made and request is made for an adjustment on a just and equitable basis.

In 9 Corpus Juris, 1200, the rule is given as follows:

"Equivocal acts which do not clearly evince the purpose, with complete knowledge of the fraud to retain the property as his own will not defeat the right of the person defrauded to rescind."

The same author, in the same volume, page 1205, says:

"No action of a party will amount to a confirmation of a fraudulent transaction, or acquiescence therein unless done with full knowledge of the fraud and while he is free from its influence."

In the light of the principles so announced, we think, as indicated, that we must sustain the findings of the trial court that the evidence fails to show that the plaintiffs in the suit ratified the fraud.

[10] By other assignments it is insisted that the judgment is erroneous, in that the uncontradicted evidence shows that the plaintiffs are unable to restore the statu quo by returning to appellants the assets of the Traders' State Bank acquired in the sale in controversy. It seems clear that by the judgment the court made the effort to do so as far as possible. It is to be further noted, as before stated, that the contract was not rescinded in toto; the commissioner of insurance and banking and the banking board yet retain the control and the right of disposition of the solvent assets of the old Traders' State Bank, as well as the assets of the Guaranty State Bank. As we recall our consideration of the evidence, there is no contention that after the organization of the Guaranty State Bank it received insolvent paper or caused bad debts; on the contrary, there is evidence tending to show that its insolvency, as finally declared by the commissioner, was caused largely, if not wholly, by the fact that so large a proportion of the assets of the old Traders' State Bank.

was worthless and not available for application to the debts of that bank which had been assumed by the Guaranty State Bank. The plaintiffs offered to return all worthless paper of the Traders' State Bank. Indeed, a failure to make such an offer of a worthless asset is not required. See State v. Snyder, 66 Tex. 687, 18 S. W. 106. As it seems to us, to enforce the rule invoked by appellants in all of its strictness in this case would be inequitable. We can think of no equitable principle, which, under the circumstances, would deny a party injured by a fraudulent act relief merely because he had been rendered unable to return an inconsiderable part, perhaps, of property received by him from a fraudulent actor, the loss of which had been proximately caused by the fraud of such actor in an honest conduct of the complainant's business. The trial court in his judgment evidently made the effort to do equity between the parties litigant, and as far as could possibly be done under the circumstances to relieve appellants from all injury not proximately caused by the fraud of their official predecessors. And we do not feel disposed to reverse the decree in this respect.

[11] A further objection urged against the judgment is that the creditors of the Guaranty State Bank had not been made parties defendant. As to this, we think it sufficient to say that appellants presented no formal plea in abatement for the want of proper parties, nor are we cited to any evidence which shows that such creditors accepted the obligation of the Guaranty State Bank to pay off the debts of the Traders' State Bank. Other questions not discussed are perhaps involved and presented in the assignments and brief of the appellants which merit notice, but they are not thought to be of vital importance or controlling effect. We therefore pass them without discussion because of the length of this opinion.

We conclude that all assignments of error should be overruled, and the judgment below affirmed.

### On Motion for Rehearing.

The material questions presented in the motion for rehearing are, we think, substantially the same as those we attempted to dispose of in our original opinion, and we do not feel clear that we can add anything of particular benefit to what is there said and implied, and to all of which we can do no better than to adhere. The motion for rehearing is accordingly overruled.

[12] The motion for additional findings will also be overruled, as we conclude that the findings sought are either immaterial, or evidentiary in character, or appear undisputed, in neither of which events is it our duty to make additional findings.